**FILED**

**JUNE 9, 2008**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MHN

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**RECEIVED**

5-5-2008

MAY  5 2008   MB

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| TOBIAS GARRETT<br><br>Defendant-Petitioner,<br><br>-vs-<br><br>WARDEN<br>TERRY MC CANN<br>Respondent-Plaintiff, | ) <br> ) <br> ) <br> ) <br> ) <br> ) Ca<br> ) <br> ) <br> ) Ho<br> ) <br> ) Ju<br> ) |

08CV2544
JUDGE CASTILLO
MAG. JUDGE COLE

TO: Micheal W. Dobbins          Chief Criminal Appeals Division
    Clerk of the Court          Attorney General's Office
    219 S. Dearborn St.         100 West Randolph St. 12 Fl
    Chgo, Ill 60604             Chgo, Ill 60601
    Prisoner Correspondence     Prisoner Correspondence

    PLEASE TAKE NOTICE That on April      2008, I have the cause to file
with the Clerk of the above Court, the attached Petition for Habeas Cor-
pus Relief. A copy is hereby served upon you.

*Tobias Garrett*
Tobias Garrett
Reg No. R-00864
P.O. Box 112
Joliet, Ill 60434

## CERTIFICATE OF SERVICE

    I, Tobias Garrett, affiant do hereby declare and affirm pursuant
to 28 USC 1746, 18 USC 1621, under the penalty of perjury that every-
thing contained herein is true and accurate to the best of my knowled-
ge and belief. i futher declare and affirm that the contents of the for-
egoing document are known to me are accurate to the best my understanding
and belief. The understanding being duly sworn upon oath depose and states
that on April 21 2008, I have mailed the above named, the following docum-
ent by placing said documents inthe U.S. Mail at the Stateville Correctio-
nal Center P.O. Box 112, Joliet, Illinois 60434 with pre paid postage.

Signed on this 21 day of April, 2008.

*Tobias Garrett*
Tobias Garrett

*HHW*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**RECEIVED**
5-5-2008
MAY  5 2008 *mb*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

United States of America ex rel.                    )
                                                     )
Tobias Garrett                                       )
(Full name and prison number)                        )
(Include name under which convicted)                 )
                                                     )
PETITIONER                                           )  (
                                                     )
          vs.                                        )        08CV2544
                                                     )        JUDGE CASTILLO
Warden Terry Mc Cann                                 )        MAG. JUDGE COLE
(Warden, Superintendent, or authorized               )
person having custody of petitioner)                 )
                                                     )    — — — — — — — — — — —
RESPONDENT, and                                      )
                                                     )
(Fill in the following blank **only** if judgment    )
attacked imposes a sentence to commence              )
in the future)                                       )
                                                     )
ATTORNEY GENERAL OF THE STATE OF                     )  Case Number of State Court Conviction:
                                                     )
Illinois                                             )  No. 00 CR 17163
(State where judgment entered)                        )

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: Cook County CourtHouse, 2650 S. California Street, Chicago, Illinois 60608.

2. Date of judgment of conviction: June 20, 2001.

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
First Degree Murder Case No. 00 CR 17163.

4. Sentence(s) imposed: 28 years

5. What was your plea? (Check one)      (A) Not guilty        ( x )
                                        (B) Guilty            (   )
                                        (C) Nolo contendere   (   )

   If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:
N/A

# PART I -- TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):    Jury (xx)    Judge only ( )

2. Did you testify at trial?  YES (xx)    NO    ( )

3. Did you appeal from the conviction or the sentence imposed? YES (xx)  NO ( )

   (A) If you appealed, give the

       (1) Name of court:  **First District Appellate Court**

       (2) Result:  **Affirmed conviction**

       (3) Date of ruling:  **August 4, 2003**

       (4) Issues raised:  **Tobias Garrent's First Degree Murder Conviction should be reduced to Second Degree Murder, as Garrett Believed that the use of Force was necessary.**

   (B) If you did not appeal, explain briefly why not:

   _____

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES (xx)    NO ( )

   (A) If yes, give the

       (1) Result  **Denied**

       (2) Date of ruling:  **December 3, 2003,**

       (3) Issues raised: **Tobias Garretts First Degree Murder Conviction should be reduced to Second Degree Murder, as Garratt Believed that the use of Force was necessary.**

   (B) If no, why not: _____

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )   No (xx)

   If yes, give (A) date of petition: _____  (B) date *certiorari* was denied: _____

PART II-COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post conviction petition in state court?

YES (xx) NO ( )

  With respect to each post-conviction petition give the following information.

  A. Name of Court:  Cook County Circuit Court

  B  Date of filing: March 3, 2004.

  C. Issues raised: That the petitioner contends that he was denied the effective assistance of trial counsel wherein counsel failed to adequately prepare the case before trial.

(2)

Trial counsel failed to adequately investigate two eyewitness to the shooting and who could have testified that the petitioner acted in self-defense.

(3)

That trial counsel failed to introduce into evidence The Street files to confirm statements made by the victim.

(4)

That trial counsel failed to object to a juror remaining on the jury after that juror admitted to the Court to having prior knowledge of petitioner's case.

(5)

That trial counsel failed to call to testify as a expert witness a Gang Task force Officer to support petitioner's self-defense theory and his use of force.

(6)

The Trial court erred in allowing a juror to remain on the jury after

4

admitting prior knowledge of the case, and for not responding, during deliberation, to a question asked of the jury.

## SUPPLEMENTAL PETITION FOR POST-CONVICTION RELIEF

### (1)

The ineffective assistance of counsel of trial and appellate counsel for failing to challenge the state's conveying prior wrongdoing to the jury through the elicitation of multiple immaterial and prejudicial assumed names.

### (2)

The ineffective assistance of appellate counsel for failing to challenge the state's improper closing argument.

### (3)

The ineffective assistance of appellate counsel for failing to challenge the inadmissible testimony about a brief "song" uttered by Kim Jones and the ineffective assistance of trial counsel for failing to preserve the error on grounds including relevance and being more prejudicial than probative.

### (4)

The ineffective assistance of trial counsel for failing to call Kim Jones and Niki garrett as witnesses In Tobias Garrett's defense.

### (5)

The ineffective assistance of trial counsel for failing to elicit that Tobias Garrett is right handed to allow the jury to better assess the testimony of prosecution witness Latrice Davis.

D. Did you receive an evidentiary hearing on your petition? YES (XX)

E. What was the Court ruling. Denied relief

F. Date of Court's ruling: March 15, 2006.

G. Did you appeal from the ruling on your Petition. YES (XX)

5

H. (a) If yes, (1) What was the result. <u>Affirmed Circuit Court Ruling.</u>

        (2) Date of decision: <u>October 19, 2007.</u>

  (b) If no, explain briefly why not: _____

I. Did you appeal, or seek leave to appeal this decision to the Highest State Court: YES (XX)

    (a) If yes, (1) What was the result: <u>Deny to heard the case.</u>

        (2) date of decision: _____

    (b) If no, explain why not: _____

2. With respect to this conviction or sentence, have you filed a petition in a state court using any other form of post-conviction procedure, such as coram nobis or habeas corpus. YES (   )        NO (XX)

  A. If yes, give the following information with respect to each proceeding;

      1. Nature of proceeding      _____

      2. Date of Petition         _____

      3. Ruling on the Petition    _____

      4. If you appealed, what was
         the ruling on appeal?      _____

      5. Date of ruling on appeal   _____

      6. If there was a further appeal,
         what was the ruling?      _____

      7. Date of ruling on appeal   _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in federal court? YES (   ) NO (XX)

  A. If yes, give name of court, case title and case number: _____

_____

  B. Did the Court rule on your petition? if so, state

    (1) Ruling: _____

    (2) Date: _____

**4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS IN ANY COURT, OTHER THAN THIS PETITION.**

YES ( )  NO (XXX

If yes, explain: _____

_____

## PART III -- PETITIONER'S CLAIMS

**BEFORE PROCEEDINGS IN THE FEDERAL CORT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(a) Ground one THE ILLINOIS STATE COURT SYSTEM APPLIED AN DECISION THAT WAS UNREASONABLE AND CONTRARY TO CLEARLY ESTABLISHED PRECEDENTS OF THE UNITED STATES SUPREME COURT IN RESOLVING A CLAIM IN VIOLATION OF STRICKLAND. TRIAL COUNSEL FAILED TO CALL KIMBERLY OR NIKI GARRETT TWO EYEWITNESSES WHO WERE AVAILABLE TO TESTIFY ON THE PETITIONER BEHALF AND WOULD HAVE CORROBORATED THE PETITIONER TRIAL TESTIMONY.

(b) Ground two: THE ILLINOIS STATE COURT SYSTEM APPLIED AN DECISION THAT WAS UNREASONABLE AND CONTRARY TO CLEALRY ESTABLISHED PRECEDENT'S OF THE UNITED STATES SUPREME COURT IN RESOLVING A CLAIM IN VIOLATION OF STRICKLAND, WHERE TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO CHALLENGE THE STATE PROSECUTOR IMPROPER USE OF EVIDENCE THAT THE PEITIONER HAD USED ALIASES IN THE PAST.

(c) Ground three: THE ILLINOIS STATE COURTS SYSTEM APPLIED AN DECISION THAT WAS UNREASONABLE AND CONTRARY TO CLEARLY ESTABLISHED PRECEDENT'S OF THE NITED STATES SUPREME COURT IN RESOLVING A CLAIM IN VIOLATION OF STRICKLAND, WHERE TIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO INTRODUCE EVIDENCE THAT THE PETITIONER WAS RIGHT HANDED.

(d) Ground four: THE ILLINOIS STATE COURTS SYSTEM APPLIED AN DECISION THAT WAS NREASONABLE AND CONTRARY TO CLEARLY ESTABLISHED PRECEDENT'S OF THE UNITED STATES SUPREME COURT IN RESOLVING A CLAIM IN VIOLATION OF JACKSON, WHERE THE STATE COURT FAILED TO PROVE THE PETITIONER WAS GUILTY BEYOND A REASONABLE DOUBT OF FIRST DEGREE MURDER. THE EVIDENCE AT THE PETITIONER

REDUCED TO SECOND DEGREE MURDER.

(f) Ground five: THE ILLINOIS AND UNITED STATES APPLIED AN DECISION THAT WAS VOID UNDER THE ILLINOIS AND UNITED STATES SUPREME COURT. THE PET-ITIONER WAS SENTENCED TO A SENTENCE WHICH DOES NOT CONFORM TO A STATUTORY REQUIREMENT UNDER THE ILLINOIS AND UNITED STATES.

2. Have all grounds raised in this petition been presented to the highest court having jurisdiction?

YES ( )    NO (XX)

3. If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:

Ground five was not raised in the state court, but this issue is a void issue which may be raised at anytime and raised in any court of the Law.

THE ILLINOIS STATE COURT SYSTEM APPLIED AN DECISION THAT
WAS UNREASONABLE AND CONTRARY TO CLEARLY ESTABLISHED PRE-
CEDENTS OF THE UNITED STATE SUPREME COURT IN RESOLVING A
A CLAIM IN VIOLATION OF STRICKLAND. TRIAL COUNSEL FAILED
TO CALL KIMBERLY JONES OR NIKI GARRETT TWO EYEWITNESSES
WHO WERE AVAILABLE TO TESTIFY ON THE PETITIONER BEHALF
AND WOULD HAVE CORROBORATED THE PETITIONER' .      TRIAL
TESTIMONY.

To pursue habeas corpus relief in Federal Court, the petitioner
first had to exhaust the remedies available in the state courts. 28 U.S.
C. § 2254 (b) See Rose v Lundy  455 U.S. 509, 520; For the purpose of
habeas corpus relief under the Antiterrorism and Effective Death Penalty
Act (AEDPA). A state court decision involves an unreasonable or contrary
application of clearly established precedents of the United States Supreme
Court if the state court applies the Court's precedents to the facts in
an objectively unreasonable manner. 28 U.S.C.A. § 2254 (d)(1) Brown v Pay-
ton 125 S.Ct. 1432, 161 L.Ed.2d 334;

Here in the present case at bar, the state court's applied Strickland
in an objectively unreasonable and in a contrary manner, where the state
courts held trial counsel was not ineffective, when in fact she was. The
United States and Illinois Constitutions guarantees a defendant the right
to the effective assistance of counsel. U.S. Const.amends. VI, XIV; Ill.
Const. 1970, art. I, § 8. A defendant is denied his constitutional right
to effective assistance of counsel where (1) his attorney's performance
falls below an objective standard of reasonable representation; and (2)
there is is a probability that the outcome of the proceedings would have
been different but for the attorney's inadequate preformance. Strickland
v Washinton 466 U.S. 668, 687-88, 692-94; People v Albanese  104 Ill.2d
504, 526, 473 N.E.2d 1246; (adopting Strickland standard)

The petitioner's trial counsel rendered constitutionally deficient
assistance when she failed to call either of the two witness who were
capable of corroborating the petitioner's defense. Evidence adduced in
the course of post-conviction proceedings indicated that counsel interview-

9

ed Kimberly Jones and Ms. Garrett, And failed to present either of
them at trial. (R.A-9-10, M-10,11, N-7). This omission is inexplicable
given that counsel admitted at the evidentiary hearing that she facto-
red her interviews with them into her decision to pursue self defense.
(R. N-7). Ms. Jones and Ms. Garrett would have each supported the defense
theory that the petitioner approached the decedent to talk to him about
threats made to his family, and only pulled a gun and fired it after the
decedent appeared to reach for a gun. Crucially, Ms. Garrett testified
at the hearing that she waw the decedent fumble under his shirt just befor
the shooting, and Ms. Jones testified she saw the decedent reach into his
pants. (R. A-19,32-33, M-9). Ms. Jones and Ms. Garrett had each signed
written statements indicating that the decedent reach into his shirt just
before the shooting. (C. 69,74). Their testimony also would have refuted
the trial testimony of Latrice Davis and Robert Green, who stated, contr-
ary to their prior statements to police, that the decedent threw his hands
up into the air in a surrender position before the petitioner fired the gu
(Tr.R. B-129-30). Instead of calling these witnesses, counsel presented
the petitioner as the sole witness to the events of July 22, 1999, and
exposed him to the state's charges that his account of events was suppor-
ted only by his self-serving statements. (Tr.R. C-61). Were it not for
counsel's ineffectiveness, the outcome of the trial would likely have
been different.

In the instant case, the petitioner's trial counsel at the evidenti-
ary hearing did not establish that her failure to call Ms.Jones or Ms.
Garrett was the result of sound trial strategy. In her testimony, trial
counsel appeared to offer up various excuses as they occurred to her.
Counsel first offered that she did not call Ms. Jones because of what she
perceived was an inadmissible hearsay statement presented by the state
that involved Ms. Jones. (R. N-9). The so-called hearsay was Latrice

Davis's testimony that, after the shots were fired, she heard Ms. Jones
sing, "What's my motherfucking name? Kim". (R. N-9; Tr.R.B-71) Counsel
offered that if Ms. Jones had testified, the error could not have been
available on appeal. (R. N-9). The statement regarding Ms.Jones's song
was not offered for the truth of the matter asserted, rather it described
Ms. Jone's alleged reaction to the shooting. Thus, this purported basis
for counsel's failure to call Ms. Jones was not a reasonable explantion
but a reflection of counsel's incompetence.

Trial counsel also gave another poor excuse, as to why she did not
call Ms. Jones, trial counsel testified that she was concerned about the
written statement Ms. Jones gave, in which she stated that she called the
petitioner a "stupid bitch" after the petitioner fired the gun. (R.N-11,13)
Counsel further stated this comment as "probably the main reason" she did
not call Ms. Jones to testify. (R. N-13).(Counsel don't know why she did
not call Ms.Jones). However, even without Ms.Jones on the stand, related
testimony about her comments was given by Latrice Davis, who said Ms. Jon-
es sang, "What's my motherfucking name? Kim". It is difficult to imagine
how the "stupid bitch" comment could have been deemed any more damaging
than the song described by Ms.Davis, which the court itself noted was
celebratory. (Tr.R. C-8). Ms. Jones would have testified about both of
these alleged comments instead of leaving those described by Ms. Davis to
stand unchallenged and unexplained

Notably, the above explanations only attempt to justify counsel's
failure to call Ms. Jones. With respect to both Ms.Jones and Ms Garrett
trial counsel contended that she wanted to prevent the state from focusing
the jury on the women as a drug dealers who wanted to eliminate the deced-
ent as their competition. (R. N-13,14). However, even without their testi-
mony, the prosecutor attached the two women as scheming drug dealers.
The state mocked Ms. Jones's home and made sarcastic comments deriding her

11

iness, including her young brother in law Chandus Ousley of whom she had
custody. (Tr.R.C.24,56). The state repeatedly called Ms. Jones's home
a drug house. (Tr.R.C-55,58) and referred to her as the petitioner's drug
dealing sister in law. (Tr.R.C-56,58,59,70). Thus, the damaging evidence
trial counsel supposely wanted to avoid came in even without the testimony
of either Ms. Jones or Ms, Garrett.

The Illinois Appellate Court held in their Appellate Court Opinion,
the following:

> "We cannot say that counsel's decision not to present the
> testimonies of Jones and Garrett, the rival drug dealers
> who instigated defendant's confrontation with the victim
> and gave him the gun he used rendered the proceeding unre-
> liable or fundamentally unfair."

See Ex. 1. pg.12.

It is clear, the Appellate Court stated "they cannot say, the failure
to call these witnesses rendered the petitioner trial unreliable or funda-
mental unfair". The Appellate Court Justices applied an unreasonable and
contrary decision to clearly establish Federal Law. The petitioner trial
counsel was clearly ineffective.  The State Appellate Court overlooked
the fact, that trial counsel listed Ms. Jones and Ms Garrett as defense
witnesses in this case. (R.A-3). In fact, the trial court asked whether
or not was trial counsel ready to proceed with trial (R.A-3). Trial coun-
sel told the court no because she had obtained service on a witness who
has not appeared in court (at trial). The witness name is Kimberly Jones,
she is a criticial witness in this case. she is an occurrence witness also
a witness to a threat made by the victim. Our defense in this case is
self-defense, judge. (R.A-3).

The same counsel further told the court that on the day of this shooting, Ms. Jones confronts the victim in this case about her brother being shot and the victim being responsible for that, and the victim says to Kimberly Jones, "Next time I send somebody up there (during a robbery at Ms. Jones home) they're going to finish the job. They not going to get shot in the arm, but get killed" (R.A-8). She further requested that the Court issued a warrant for Ms. Jones arrest. (R.A-9). The very next day of the petitioner trial, Ms. Jones showed up and then trial counsel decidied not to call her as a witness.

Although counsel's decision regarding whether or not to present a particular witness is generally a matter of trial strategy, counsel may be deemed ineffective for failure to call a witness whose testimony would support an otherwise uncorroborated defense. Even when counsel conducts an adequate investigation into a potential defense witness a court may not assume that counsel made a professionally reasonable tactical decision not to call witnesses who would have corroborated the defendant's testimony and contradicted the testimony of state witnesses.

In the instant case, the petitioner's trial counsel at the evidentiary hearing did not establish that her failure to call Ms. Jones and or Ms. Garrett was the result of sound trial strategy. For example, Ms. Jones testified at the evidentiary hearing, that before the petitioner trial she met with the petitioner trial counsel, and trial counsel picked her up and went to her office (R.M-10). And she told trial counsel about the argument and about the victim hand movement. (R.M-11). and trial counsel told her she was going to call her as a witness. (R.M-11). See Ex.2.

Ms. Garrett, testified at the evidentiary hearing, and she states that she talked to the petiioner trial counsel a week prior to the petitioner trial (R.A-9). She was also subpoenaed to testify in the petitioner trial. (R.A-9) And she was at the petitioner trial everyday waiting to be called

13

as a witness (R.A-10). And the petitioner trial counsel wanted her
to testify (R.A-10}. Ms. Garrett would have testified that she had con-
tact with the victim earlier that day (shooting date) (R.A-11). The vic-
tim said he was going to kill this bitch (meaning the petitioner sister)
(R.A-12) The victim also showed the petitioner sister a gun (R.A-13). She
further testified that she told the petitioner what the victim did (expla-
ins the petitioner actions) (R.A-14). Ms. Garrett would have testified
that when the petitioner confronted the victim, the victim was fumbling
under his shirt and the petitioner shot the victim. (R.A-19). See Ex.3.

The petitioner trial counsel was ineffective.In her testimony at
the evidentiary hearing, trial counsel appeared to offer up various exc-
uses as they occurred to her. Counsel first offered that she did not call
Ms. Jones because of what she perceived was an inadmissible hearsay state-
ment presented by the state that involved Ms. Jones. Trial counsel testi-
fied that the evidence that Ms. Jones after the shooting, had sang a
song, and that witness, that state witness went into that, which she ob-
jected to at the time and considered improper hearsay testimony (R.N-9)
trial counsel further testified that it was one of the things that fact-
ored into her decision not to call Kimberly Jones. She believed had she
called Kimberly Jones, that error would no longer be available for a
future appeal should the petitioner his trial. (R.N-9).

At the evidentiary hearing Ms. Jones testified that she nevered sang
a song that said "what is my motherfucker name, Kim". (R.M-36). Ms. Jones
should have been allowed to testified to contradict the state witness tri-
al testimony. The petitioner trial counsel, basically, left the state wit-
ness trial testimony unchallenged.

Finally, counsel's concerns regarding alleged inconsistencies in
Ms. Jones's and Ms. Garrett's prior statements are insupportable. Coun-
sel said she was not worried about alleged oral statements initially

**14**

made by Ms. Jones, but thought that the signed statement given by both women would damage the defense because they said saw the decedent reach into his shirt before the shooting, whereas the petitioner testified that the decedent reached into his pants. (R.N-12,18). Yet counsel argued in her own opening statement that the jury would hear evidence that the petitioner feared he was about to be shot because he saw the decedent go under his shirt and into his pants (Tr.R.B-16) Moveover, Ms. Jones did in fact specify at the evidentiary hearing that she saw the decedent reach into his pants (R.M-9) Thus, the inelaborate written statements were consistent with the petitioner trial testimony and Mr. Jones and Ms. Garrett could have clarified their observations if they had testified at trial.

Instead, the petitioner' testimony stood alone and was vulnerable to the state's attack that it was "self-serving" (Tr.R.C-61). He was the only one to state that the decedent reached into his pants. Although Detective Trahanas testified that the decedent's friends Latrice Davis and Robert Green failed to mention in previous statements that the decedent had put his hands in the air before the shooting, the testimony of either Ms. Garrett or Ms. Jones would have likely persuaded the jury that the new account described by Ms. Davis and Mr.Green was an invention they came up with for trial. Instead, the jury had to determine the veracity of the petitioner account of events without the support of corroborating witnesses. the prosecutor exploited this weakness and specifically pointed out that the peitioner's self-defense explanation was uncorroborated, stating "the only person that tells you that tells you that that occurred, oh, it's him. (Tr.R.C-61).

The fragility of the jury's eventual guilty finding is evident in their numerous communication to the trial court, wherein they requested the transcripts of witness testimony as well as additional evidence and at one point indicated they were at an impasse. (Tr.C.35-42; Tr.R. C-96-

15

Had Niki Garrett and Kimberly Jones been called they could have testified, both to prior threats, and a prior showing of a gun. As the petitioner testified and to the decedent's movement on the basketball court, that were consistent with what the petitioner would have said. And the contradiction in trial counsel testimony at the evidentiary hearing satifies the second prong of Strickland 466 U.S. 28 U.S.C.A. § 2254(d)(1) and ignored the fact Niki Garrett and Kimberly Jones testimonies corroborates with that of the petitioner, that he acted in self-defense.

Accordingly, the petitioner asks that this Honorable Court to finds that the Illinois State Court applied an contrary and an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in their decision to deny the petitioner relief This petitioner is entitle to habeas corpus relief in this case.

THE ILLINOIS STATE COURT SYSTEM REACHED AN DECISION THAT

WAS UNREASONABLE AND CONTRARY TO CLEARLY ESTABLISHED PRE-
CEDENT'S OF THE UNITED STATES SUPREME COURT IN RESOLVING
A CLAIM IN VIOLATION OF STRICKLAND, WHERE TRIAL COUNSEL
WAS INEFFECTIVE WHEN SHE FAILED TO CHALLENGE THE STATE
PROSECUTOR IMPROPER USE OF EVIDENCE THAT THE PETITIONER
HAD USED ALIASES IN THE PAST.

To pursue habeas relief in Federal Court, the petitioner first had

to exhaust the remedies available in the state court. 28 U.S.C. § 2254 (b)

See Rose v Lundy 455 U.S. 509, 520; For the purpose of habeas corpus rel-

ief under the Antiterrorism and Effective Death Penalty Act (AEDPA). A

state court decision involves an unreasonable or contrary application of

clearly established precedents of the United State Supreme Court if the

state court applies the Court's precedents to the facts in an objectively

unreasonable manner. 28 U.S.C.A. § 2254 (d)(1) Brown v Payton  125 S.Ct.

1432, 161 L.Ed.2d 334;

The Illinois State Court system applied an erroneous standard in resol

ving a claim in violation of Strickland. (Illinois Appellate Court opinion

pages 13-15 attached hereto in the appredix as Exhibit 1.) Here in the

present case at bar, the state court's applied Strickland in an objectively

unreasonable and in a contrary manner, where the state courts held trial

counsel was not ineffective, when in fact she was.

The United States and Illinois Constitutions guarantees a defendant

the right to effective assistance of counsel. U.S. Const. amends VI, XIV;

Ill. to the effective assistance of counsel where (1) his attorney's per-

formance falls below an objective standard of reasonable representation;

and (2) there is a probability that the outcome of the proceedings would

have been different but for the attorney's inadequate performance. Strick-

land v Washington 466 U.S. 668, 687-88, 692-94; People v Albanese  104 Ill

2d 504, 526, 473 N.E.2d 1246; (adopting Strickland standard).

As the prosecution commenced its cross examination of the petitioner

at trial, it asked him about an alias he used when arrested following the

17

1999 shootings and charges he used when arrested for a prior, unrelated offense in 1997 and 1998. This line of questioning was highly improper, and trial counsel should have objected to it. Before addressing the facts of the instant case, the state questioned the petitioner as follows:

State: By the way, what's your name?

The petitioner: Tobias Garrett.

State: Now, when you were in Wisconsin your name was James Hackman right?

The petitioner: Yes.

State: So that's not really your name?

The petitioner: No.

State: So you were lying when you said that was your name, right?

The petitioner: Yes.

State: And you've lied about your name before, right?

The petitioner: Yes.

State: When you talked to Officer Farrell you told him your name was Tobias Jones back in 1997, right?

The petitioner: Yes

State Prior to that time you used the name Cortis Sorrells to an Officer Sutherland?

The petitioner: Yes.

State: And you were lying when you used that name, right?

The petitioner: Yes.

(Tr.R.B-159-60).

The state engaged in this line of questioning in order to call attention to the petitioner's previous interactions with the police and to label him a liar. (Tr.R.C-56). This use of evidence was clearly improper, and yet defense counsel failed to voice a single objection either during questioning or closing arguments. As a result, the state was free to sully the petitioner's credibility with prejudicial insinuations about his past

18

Evidence of the use of an alias is admissible only if shown to be material to some issue in the case. Arguably, the state could have quest- ioned the petitioner about his use of an alias upon arrest in the instant matter, as the use of a false name after the commission of a crime may be relevant on the issue of consciousness of guilt. However, evidence of the aliases used in 1997 and 1998 were by no means material. This evidence was raised solely to create an inference that the petitioner had used assumed names in the past in order to evade apprehension by law enforcement for prior criminal offenses. Using the petitioner assumed names had nothing to do with the issues in the case and served only to prejudice the jury.

Trial counsel failed to discharge her duty of effective representation when she sat silent throughout the state's questioning regarding the petiti oner's past use of assumed names. Additionally, because of her silence, app ellate counsel could not challenge the state's improper references to the aliases. In denying relief, the post-conviction court only addressed this claim by noting that the petitioner had testified, and that the state was allowed to explore the fact the he lied about his name to the police (R. N-49) The court did not directly address the merit of this claim,but rej- ected it along with the other appellate issues in one brief pronouncement stating that it could not find "that anything that happened during his cross-examination nor during closing arguments by the prosecutor caused the jury to reach verdicts they would not have otherwise reached" (R.N-50).

The Appellate Court held the following concerning this issue;

"Because defendant has failed to demonstrate that trial counsel was ineffective for failing to object to this testimony (The st- ate prosecutor questioning defendant about his assumed names ) We concluded that appellate counsel's failure to raise the iss- ue on appeal did not amount to ineffective assistance of couns- el."

19

The state Appellate Court decision is in direct contradiction with clearly established Federal Law, by the United States Supreme Court. Clearly trial counsel was ineffective for failing to object o the state prosecutor improper cross-examination of the petitioner about his prior use of assumed names, which projected the petitioner to be some sort of liar. It was prejudicial and not probative evidence, and it should have been objected to which trial counsel failed to do in this case. However, Appellate counsel was ineffective for failing to raise trial counsel error on the petitioner direct appeal. The state Appellate court decision to deny this petitioner relief was unreasonable and contrary to the United States clearly established Federal Law.

The key to the jury decision in this case, was whether to credit the petitioner's assertion that he believed he was acting in self-defense, yet counsel permitted the state to freely smear her client as someone who could not be believed because of the nature of his frequent interaction with law enforcement. In light of the jury's lengthy deliberations and continued struggle with the evidence, the highly prejudicial effect of this type of evidence was particularly damaging.

Accordingly, the petitioner asks that this Honorable Court finds that the Illinois State Court applied an contrary and an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States inthier decision to deny the petitioner relief. This petitioner is entitle to h beas corpus relief in this case.

THE ILLINOIS STATE COURTS SYSTEM APPLIED AN DECISION THAT
WAS UNREASONABLE AND CONTRARY TO THE CLEARLY ESTABLISHED PRE-
CEDENT'S OF THE UNITED STATES SUPREME COURT IN RESOLVING
A CLAIM IN VIOLATION OF <u>STRICKLAND</u>, WHERE TRIAL COUNSEL
WAS INEFFECTIVE WHEN SHE FAILED TO INTRODUCE EVIDENCE THAT
THE PETITIONER WAS RIGHT HANDED.

To pursue habeas relief in Federal court, the petitioner first had
to exhaust the remedies available in the state court. 28 U.S.C. § 2254 (b)
See <u>Rose v Lundy</u> 455 U.S. 509, 520; For the purpose of habeas corpus rel-
ief under the Antiterrorism and Effective Death Penalty Act (AEDPA). A
state court decision involves an unreasonable or contrary application of
clearly established precedents of the United States Supreme Court if the
state court applies the Court's precedent's to the facts in an objectively
unreasonable manner. 28 U.S.C.A. § 2254 (d)(1) <u>Brown v Payton</u> 125 S.Ct.
1432, 161 L.Ed.2d 334;

The Illinois State Court system applied an erroneous standard in reso
lving a claim in violation of <u>Strickland</u> . (Illinois Appellate Court opin-
ion pages 15-16 attached hereto in the apprendix as Exhibit 1.) Here in
the present case at bar, the state court's applied <u>Strickland</u> in an objec
tively unreasonable and in a contrary manner, where the state courts held
trial counsel was not ineffective, when in fact, she was.

The United States and Illinois Constitutions guarantees a defendant
the right to effecive assistance of counsel. U.S Const. amends VI, XIV;
Illinois. To the effective assistance of counsel where (1) his attorney's
performance falls below an objective standard of reasonable representation
and (2) there is a probability that the outcome of the proceedings would
have been different but for the attorney's inadequate performance. <u>Strick-
land v Washington</u> 466 U.S. 668, 687-88, 692-94; <u>People v Albanese</u> 104 Il
2d 504, 526, 473 N.E.2d 1246; (adopting Strickland standard).

In addition to the errors discussed above, trial counsel also failed
to present a significant piece of evidence that that would have cast dou-
bt on the dubious testimony of Latrice Davis. Ms. Davis testified that

21

the petitioner approached the decedent with his husband in his left pocket
before pulling out a gun (Tr.R.B-64). During the petitioner's testimony
at trial, counsel should have elicited hat the petitioner is right-handed.
In his post-conviction petition, the petitioner alledge not only that he
right handed, but that he pointed this out to his counsel during Ms. Davis'
testimony. (C29) As a general rule, the failure to make use of obviously
useful impeachment against a key state witness constitutes ineffective
assistance of counsel.

The record makes clear that the jury considered this an important
piece of evidence. During deliberations, the jury submitted a note to the
Court asking: "Is Tobias (the pet) left or right handed? (Tr.C.37; Tr.R
C-98). Because counsel failed to elicit this evidence through the petition-
er's testimony or in any other manner, all the court could do was tell the
jury that they had all of the evidence and should continue to deliberate
(Tr.C.37; Tr.R.C.100). The jury's concern about this fact during their
deliberations indicates they were likely struggling with Ms. Davis's credi-
ibility. If counsel had shown that the petitioner is right handed, the
jury would have likely concluded that Ms. Davis's testimony contained ina-
ccuracies and could not be credited

In denying relief, the post-conviction court did not address this cla-
im. Even if this omission alone did not affect the outcome of the trial,
the combination of this error and those discussed above undermines the out-
come of the proceedings. Counsel's failure to call even one corroborating
witness and her neglect to challenge the state's use of obviously improper
evidence regarding the petitioner's aliases amounts to defective represent-
ation. The jury's deliberation spilled into a second day and only ended
after various requests for evidence, concerns that they were reaching
an impasse, and even a question specifically addressing second degree
murder.

22

The state appellate court decision on this issue:

"We are not persuaded differently by defendant's argument

  that the jury question inquiring whether defendant was

  left or right handed during jury deliberation demonstrates

  that the jury was "struggling" with Ms. Davis credibility

  and, "if counsel has shown that defendant is right handed

  the jury would have likely concluded that Davis testimony

  should not be credited. Defendant's assertions are unsuppor-

  ted conclusions."

See Ex.1 pg.16-17. See Ex. 4. Also.

    The state appellate court applied an unreasonable and contrary deci-

sion to clearly established federal law, as determined by the United States

Supreme Court. The petitioner trial counsel was clearly ineffective, where

she failed to introduce evidence  that the petitioner was right handed and

not left handed as Ms. Davis testified to.(Tr.R.B-64). As a general Rule

the failure to make use of obviously useful impeachment against a key sta-

te witness constitutes ineffective assistance of counsel.

Accordingly, the petitioner asks that this Honorable Court finds that the

Illinois State Court applied an contrary and an unreasonable application

of clearly established federal law, as determined by the Supreme Court

of the United States in their decision to deny the petitioner relief. This

petitioner is entitle to habeas corpus relief in this case.

                                    23

THE ILLINOIS STATE COURTS SYSTEM APPLIED AN DECISION THAT
WAS UNREASONABLE AND CONTRARY TO CLEARLY ESTABLISHED PRE-
CEDENT'S OF THE UNITED STATES SUPREME COURT IN RESOLVING
A CLAIM IN VIOLATION OF JACKSON, WHERE THE STATE COURT
FAILED TO PROVE THE PETITIONER WAS GUILTY BEYOND A REASON-
ABLE DOUBT OF FIRST DEGREE MURDER. THE EVIDENCE AT THE
PETITIONER TRIAL SHOWS THAT THE PETITIONER FIRST DEGREE
MURDER CONVICTION SHOULD BE REDUCED TO SECOND DEGREE MURDER.

To Pursue habeas relief in Federal court, the petitioner first had

to exhaust the remedies available in the state court. 28 U.S.C. § 2254 (b)

See Rose v Lundy 455 U.S. 509, 520; For the purpose of habeas corpus rel-

ief under the Antiterrorism and Effective Death Penalty Act (AEDPA). A

state court decision precedents of the United States Supreme Court if the

state court applies the Court's precedent's to the facts in an objectively

unreasonable manner. 28 U.S.C.A. § 2254 (d)(1) Brown v Payton 125 S.Ct.

1432, 161 L.Ed.2d 334;

The Illinois State Court system applied an erroneous standard in reso

lving a claim in violation of Jackson . ( Illinois Appellate Court opin-

ion pages 6-10, attached hereto in the apprendix as Exhibit 1. ) Here in

the present case at bar, the state court's applied Jackson in an object-

ively unreasonable and in contrary manner, where the state courts held

the petitioner was proven guilty beyond a reasonable doubt of first deg-

ree murder.

The issue is whether the petitioner was proven guilty beyond a rea-

sonable doubt of first degree murder. The standard of review for this

issue is whether, after reviewing the evidence most favorably to the pro-

secution, any rational trier of fact could have found the essential ele-

ments of the offense beyond a reasonable doubt. Jackson v Virginia 443

U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560;

When a defendant is tried for First degree murder, in order to be

found guilty of second degree murder, he must prove by a preponderance

of the evidence , the presence of a statutory mitigating factor. 720

ILCS 5/9-2, (West 2001). If the defendant meets this burden, then the

state must disprove beyond a reasonable doubt any mitigating factor that
the defendant has raised.

A person commits the offense of second degree murder when he commits
the offense of first degree murder and at the time of the killing, he
believes that his use of force is necessary to prevent imminent death
or great bodily harm to himself or another, but his belief was unreason-
able. 720 ILCS 5/9-2 (A)(2) (West 2001). Second degree murder is a lesser
mitigated offense of first degree murder. To reduce an offense from first
degree murder to second degree murder, the burden is on the defendant to
prove that he believed that his force was necessary.

In the case at bar, a jury convicted the petitioner of first degree
murder. (R.D-3). because the petitioner believed that the use of force was
necessary to prevent the killing or infliction of great bodily harm upon
himself, the evidence supports a conviction of second degree murder, rat-
her than first degree murder. Even viewing the evidence favorably to the
prosecution, the existence of a mitigating factor has been established by
a preponderance of the evidence. In such cases, the evidence will support
a conviction for second degree murder, but not first degree and the appel-
late court must reduce the conviction and remand for resentencing.

In the instant case, there was evidence of Richard Johnson's violent
disposition. The petitioner's sister in law, Kimberly Jones had told him
that she and Johnson had argued and he had pulled a gun on her, and threa-
tened to kill someone that night. 'R. B-144,147). The matter concerned
drugs, and pertained to an incident where the petitioner little brother
had been shot in May 1999, over drugs. (B150,51). Kimberly Jones asked
him to spend the night out there with then, having been told that some-
body was going to be killed "this time". (R-149). The petitioner got scar-
ed and took a gun from his sister's purse and put the gun in his pocket
to protect himself. (r.B-152,153).

25

The petitioner intended to talk to Richard Johnson, not shoot him (R. B-153). He said, "hey man, what's up" (R.B-156). Johnson turned around and reached for something in his jogging pants, (R.B-156). The petitioner thought that John son had a gun in his jogging pants and was going to try to kill the petitioner. (R. B-156). The petitioner became afraid for his life and upped the gun and began shooting. (R. B-156). The petitioner fired two or three times. (R.B-157). He thought that if he did not shoot, then Johnson would have killed him. (R. B-158).

In addition, Richard Johnson was a known drug dealer. (R. B-57). Even the state's witnesses were aware that trouble with Richard Johnson was looming. Robert Green heard Johnson say that he (Johnson) and Kim Jones had got into it or something over something. (R. B-86). Willie Campbell testified that Johnson and Kim Jones has argued earlier that day about Jones selling marijuana on Central in competition with drug dealer Johnson (R. B-102, 111-113). Latrice Davis testified that Richard Johnson said it's about to be some trouble when he seen the petitioner. (R. B-61).

The petitioner proved that he believed that his use of force was necessary. This Court should reduce the degree of the offense from which the petitioner was convicted from first degree murder to second degree murder

The state appellate court applied an unreasonable and contrary decision to clearly established federal law, as determined by the United States Supreme Court. The Illinois State Court should be reversed and this Honorable Cort should grant this petitioner writ of habeas corpus.

Case 1:08-cv-00014   Document 14   Filed 08/09/2008   Page 27 of 64

THE ILLINOIS AND UNITED STATES APPLIED AN DECISION THAT WAS
VOID UNDER THE ILLINOIS AND UNITED STATES SUPREME COURT. THE
PETITIONER WAS SENTENCED TO A SENTENCE WHICH DOES NOT CONFORM
TO A STATUTORY REQUIREMENT UNDER THE ILLINOIS AND UNITED STAT-
ES.

To pursue habeas relief in Federal Court, the petitioner first had
to exhaust the remedies available in the state court. 28 U.S.C. § 2254(d)
See Rose v Lundy  455 U.S. 509, 520; For the purpose of habeas corpus rel-
ief under the Antiterrorism and Effective Death Penalty Act (AEDPA). A
state court decision precedents of the United States Supreme Court if the
state cort applies the Court's precedent's to the facts in an objectively
unreasonable manner. 28 U.S.C.A. § 2254 (d)(1). Brown v Payton   125 S.Ct.
1432, 161 L.Ed.2d 334;

The Illinois State Court system applied an erroneous standard in reso-
lving a claim in violation of Due Process under Illinois and the United
States. Here in the present case at bar, the state court applied an void
sentence in an objectively unreasonable and in a contrary manner, where
the state court sentenced the peitioner to two mandatory sentences, which
conflict with each other. Also the trial court gave no indication that
the petitioner was to be sentenced to a hundred percent for his murder
conviction.

The issue is whether the petitioner sentence of a hundred percent
violates due process under the Illinois and United States Constitutions.
A sentence that does not conform to statutory requirements is void. People
v Arna 658 N.E.2d 445, and A void sentence may be attacked at any time and
are not waived by a petitioner's failure to raise them in a prior proceed-
ing because such challenge may be raised at any time. People v Wooters
722 N.E.2d 1102; People v Brazie 738 N.E.2d 646;

Here in the present case, at sentencing, the court stated the follow-
ing just before handing down the petitioner sentence for first degree mur-
der conviction.

27

" I will consider his testimony in this case as something
for less that accepting any responsible here. The sente-
nce will be 30 years inthe penitentiary." E-30 (On August
14, 2001, knock off 2 years).

Under the Illinois Law the Statute provides a sentencing court with
guildance, in order to apply truth in sentencing (100%) to a case, which
the sentencing court failed to do in this case. For example, the Illinois
Statutes states the following:

When a sentence of imprisonment is imposed for first degree murder
(as here) and the offense was committed on or after June 19, 1998, the
judge's statement, to be given after pronouncing the sentence, shall incl-
ude the following:

" The purpose of this statement is to inform the public of
the actual period of time this defendant is likely to spe-
nd in prison as a result of this sentence.The actual period
of prision time served is determined by the statutes of Ill-
inois as applied to this sentence by the Illinois Department
of Corrections and the Prisoner review Board. In this case,
the defendant will serve 100% of his or her sentence."

The trial court in this case, did not conform with, the statute, ther-
eby voiding out the truth in sentencing part of the petitioner sentence.

The principle has often been stated that a sentence. or portion thereby
that is not authorized by statute is void People Ex Rel Walker v McKoski
195 Ill.2d 393, 401, 254 Ill.Dec. 729, 748 N.E.2d 175; See Illinois Statu-
tes 730 ILCS 5/5-4-1, (c);

This petitioner is also void where the petitioner is given two manda-
tory sentences, which conflicts with each other. For example, the petitio-
ner is serving a hundred percent of his sentence, and the he is given add-
itional three years for Mandatory Supervised Released (Parole).

Pursuant to section 5-8-1(d)(1) of the Unified Code of Corrections (the Code) 730 ILCS 5/5-8-1(d)(1) (West 1998) he would be subject to a three year period of mandatory supervised release (MSR) following his (the petitioner) his 28 years sentence for murder.

The order of sentence and the commitment in the record also shows the petitioner was sentenced on the count of murder to 28 years IDOC. The sentencing order makes no reference to the three year mandatory supervised release term required by law. Section 5-8-1(d)(1) of the Code provisdes:

"Except where a term of natural life is imposed, <u>every sentence shall include as though written therein a term in addition to the term of imprisonment</u>. For those sentenced under the law in effect prior to February 1, 1978, such term shall be identified as a parole term. For those sentenced on or after February 1, 1978, such term shall identified as a mandatory supervised release term. Subject to earlier termination under Section 3-3-8 (730 ILCS 5/3-3-8) the parole or mandatory supervised release term shall be as follows:

(1) for first degree murder or a class X felony, 3 years.

This is a form of an unauthorized consecutive sentences. To sentenced a defendant to two mandatory sentences, is clearly unconstitutional.

(1) one is a hundred percent for murder.

(2) Three years mandatory supervised release (parole).

To have a defendant to serve all his time in prison for murder then to sentence the defendant to serve additional three years Mandatory Supervised Release is clearly unconstitutional, and this petitioner ask that this Honorable Court hold that the petitioner truth in sentencing (100%) is unconstitutionally applied to this petitioner sentence.

29

here this Honorable Court has the Independent duty to upscale a
void order and may sua sponte declare an order void. <u>Schak v Blom</u>
334 Ill.App.3d 129, 134, 267 Ill.Dec. 832, 177 N.E.2d 635;

This petitioner ask that this Court finds that the state court appl-
ied an unreasonable and unconstitutional sentence, where the petitioner
is sentenced to truth in sentencing, after the trial court failed to
conform with the truth in sentencing statute. Also the petitioner is sen-
tenced to two mandatory Statutes which is in conflict with each other.
The petitioner ask that this Court send a order ordering IDOC to reflect

the petitioner sentence is to proceed under 50 percent of the 28 years of which he was sentenced to.

Case 1:08-cv-52544 Document R7 Filed 06/09/2008 Page 3 of 64

PART IV -- REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing **Jean Herigodt** _____

(B) At arraignment and plea **Jean Herigodt** _____

(C) At trial **Jean Herigodt.** _____

(D) At sentencing **Jean Herigodt** _____

(E) On appeal **Janet Stewart** _____

(F) In any post-conviction proceeding **Suzanne A. Isaacson** _____

(G) Other (state): _____

PART V -- FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )    NO ( **x** )

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _____                    **N/A** _____
           (Date)                                 Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_____
(Signature of petitioner)

_____
(I.D. Number)

_____
(Address)

REVISED 01/01/2001

32

1. Appellate Court Opinion from Post-Conviction Petition.          Ex.1.

2. Kimberly Jones affidavit.          Ex.2.

3. Niki Garrett affidavit.          Ex.3.

4. Tobias Garrett affidavit.          Ex.4.

5. Appellate Court Opinion from Direct appeal.          Ex.5.

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

*Donahoe*

Case 1:08-cv-02544    Document 11    Filed 06/09/2008    Page 34 of 64

FIFTH DIVISION
October 19, 2007

No. 1-06-0788

IN THE APPELLATE
COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00CR17163 |
| | ) | |
| TOBIAS GARRETT, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

### ORDER

Defendant Tobias Garrett appeals from an order of the circuit court denying his petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2004)). On appeal, defendant contends that the trial court erroneously denied his postconviction petition following an evidentiary hearing where he was denied the effective assistance of trial counsel when counsel: (1) failed to present two pertinent occurrence witnesses; (2) failed to challenge the State's improper use of evidence that defendant had used aliases in the past; and (3) failed to introduce evidence that defendant was right-handed. For the following reasons, we affirm.

Following a jury trial in which he argued self defense, defendant was convicted of first degree murder for the shooting death of Richard Johnson, and sentenced to 30 years in prison.[1]

---

[1]The prison sentence was later reduced to 28 years.

1-06-0788

On direct appeal, this court affirmed defendant's conviction and sentence. People v. Tobias Garrett, No. 1-01-3378 (2003) (unpublished order under Supreme Court Rule 23). Because the facts of the offense are fully set out in our order on direct appeal, we restate here only those facts necessary to an understanding of defendant's current appeal.

The following facts are undisputed. On the evening of July 22, 1999, defendant drove to Austin Town Hall park (the park) in Chicago to visit his sister-in-law, Kim Jones. Jones was also the legal guardian of Chandus Ousley, defendant's brother, who had sustained a gunshot wound a few weeks prior to this incident during a home robbery. The park was roughly the size of a city block and featured a basketball court. Jones sold drugs in the area with defendant's sister, Niki Garrett (Garrett). The victim also sold drugs in the area. The two had argued earlier that day because Jones' sales were infringing on the victim's turf. After speaking with Jones, defendant approached the victim and shot him twice, wounding him fatally.

At trial, Latrice Davis testified that she spoke with the victim near the park at approximately 7 p.m. Upon seeing Jones and an unidentified woman approaching, the victim said, "it's about to be some trouble." Davis noted a vehicle with two occupants including defendant drive by slowly. Defendant, the driver, looked at Davis and the victim and drove on. In response, the victim left Davis and walked toward the basketball court, where a number of men were in the midst of a game. Davis saw defendant make a U-turn and park his car. Davis testified that defendant left his car and strode toward the victim with his left hand in his pocket. When defendant was five feet from the victim, the victim put his hands "over [his] head spread out in a surrender position." Davis saw defendant draw a gun and shoot at the victim. The victim turned

2

1-06-0788

to run, and defendant fired another shot. Defendant then walked back to his car and drove away.

Davis further testified that after the victim was shot, Jones sang a song which went, in part,

"What's my [expletive] name? Kim." When initially interviewed by the police, Davis did not

inform them that the victim raised his hands shortly before being shot. On cross-examination,

Davis testified that the victim sold marijuana in the park.

Robert Green testified that, prior to the shooting, he overheard the victim say that he and

Jones had gotten into an argument. He also testified that the victim "threw his hands up" before

being shot, with his hands stretched outward, the palms extended and facing forward.

Willie Campbell, a convicted drug offender, testified that he observed the earlier argument

between Jones and the victim. He testified that the argument was about Jones selling drugs in the

neighborhood, and denied that the victim had threatened Jones. Campbell saw defendant arrive at

the park, exit his car, and speak with Jones and her friend. Later, he saw defendant approach the

victim, who was standing on the basketball court, and shoot him. On cross-examination,

Campbell revealed that he helped the victim sell drugs in the neighborhood.

Defendant testified that he drove to the park on July 22, 1999, to visit Jones, who sold

drugs near the park. Jones subsequently told defendant that she had been arguing with a man who

pulled a gun on her and stated that he was going to "kill somebody tonight[.] Based on his

conversations with Jones and Garrett, defendant concluded that the victim planned to return to

the park at nightfall and murder Jones. Later, Jones saw the victim and pointed him out to

defendant. Motivated by fear, defendant grabbed Garrett's purse and removed a gun, which he

placed in his pocket. Defendant testified that he understood "something would probably happen

3

1-06-0788

[] when I go [] to talk to him." Defendant reentered his car and drove a short distance towards the victim. After parking, defendant told a friend to stay in the car so that the victim would not misinterpret defendant's intent. Upon entering the basketball court, defendant told the victim, "hey man, what's up. Come here." Before defendant was able to indicate that he simply wanted to talk, the victim reached into his pants. Defendant mistakenly believed that the victim was reaching for a firearm. In fear for his life, defendant drew his gun and started shooting. Defendant testified that he never actually saw the victim wield a gun, that he saw the victim "reaching up in his pants" and so he "shot right away." After the incident, defendant fled to Racine, Wisconsin.

On cross-examination, defendant admitted that the written statement he prepared with the police did not include the allegation that the victim threatened Jones. Defendant, however, testified that he relayed this information to the police, who failed to record it. Defendant denied having heard Jones tell the victim, "What's my [expletive] name? Kim," explaining that he left the scene immediately after the shooting. Defendant also conceded that, while his brother had been shot during the prior robbery of Jones' house, the victim was not implicated in that crime.

Chicago police officer Fayad testified for the defense that he responded to a robbery with a handgun at Jones' house on May 27, 1999. During the robbery, defendant's 15-year old brother was shot in the arm. The victim was not named as a possible offender.

The jury, instructed on first degree murder, self-defense, and second degree murder, found defendant guilty of first degree murder. Defendant was sentenced to 30 years in prison, which was later modified to a 28-year prison term.

4

1-06-0788

On direct appeal, defendant argued that, because he believed that his use of deadly force was necessary to avert his own death or great bodily harm, his conviction should be reduced to second degree murder. We disagreed, and affirmed his conviction and sentence. People v. Tobias Garrett, No. 1-01-3378 (2003) (unpublished order under Supreme Court Rule 23).

Defendant filed a *pro se* postconviction petition on March 3, 2004. The trial court appointed an attorney to represent defendant during postconviction proceedings. Defendant then filed a supplemental petition for postconviction relief on June 28, 2005, contending, *inter alia*, that (1) trial counsel was ineffective for failing to call two witnesses, Kim Jones and Niki Garrett, to corroborate defendant's self-defense theory; (2) that trial and appellate counsel were ineffective for failing to challenge the State's "conveying prior wrongdoing through the elicitation of multiple immaterial and prejudicial assumed names;" and (3) trial counsel was ineffective for failing to introduce evidence that defendant was right-handed. The State filed a motion to dismiss the supplemental petition, which was denied following a hearing on the motion. An evidentiary hearing was held on February 23, 2006.

At the evidentiary hearing, Garrett, defendant's sister, testified that she met with defendant's trial counsel prior to defendant's trial. She was subpoenaed and came to court each day of the trial ready to testify, but was not called to do so. Garrett testified that she saw defendant shoot the victim. She testified that, earlier in the day of the shooting, the victim showed her a gun and threatened to kill her. She told defendant about the threat, who then spoke with Jones, and eventually went to the park and found the victim. When defendant yelled, the victim turned around with his hands under the front of his shirt and said something inaudible.

5

1-06-0788

Garrett testified that the victim "kept fumbling with his shirt," and did not raise his hands into the air nor out to both sides. Then, defendant shot the victim.

On cross-examination, Garrett admitted that she did not call the police to report the alleged threat that occurred the morning of the shooting, but only relayed the threat to Jones and defendant. Soon after Garrett was threatened, Jones spoke to the victim, and, upon returning to the house, retrieved her gun and put it in Garrett's purse, which defendant had with him upon confrontation with the victim. Garrett testified that defendant approached the victim, they argued briefly, and defendant shot the victim. Garrett denied having seen a gun in the victim's hand. After the shooting, defendant drove away in his car. Garrett spoke with the police for the first time in October 1999 and told them the victim had threatened her. She testified that she signed her written statement which did not mention the victim's threat without reviewing it. Garrett testified that, at the time of the shooting, she was helping Jones sell drugs, and that she argued with the victim, who also sold drugs, about who could sell drugs in the area.

Jones testified that she was at the park when her brother-in-law, defendant, shot the victim, who had a "competing business interest" with her. She testified that, earlier that day, the victim showed her a gun and threatened her, saying, "if the [expletive] came to your house last time and didn't nobody die, the next time we come back, somebody going to die." She explained that her brother had been shot during a recent home robbery, and she understood the victim's threat to mean that he was the one who had broken into her house. When defendant arrived at the park later that day, she told him that the victim had threatened her and shown her his gun. She testified that defendant then drove a short distance before entering the park on foot to talk to

6

1-06-0788

the victim. She was about 50 feet from defendant and the victim, and had a clear view of them. Jones testified that defendant and the victim were talking when the victim reached into his pants "as if he was reaching for something" and defendant shot him. She denied having seen the victim raise his hands. After the shooting, she asked the defendant, "What did you just do? You just F'ed up where I got to stay at." She denied having said, "What's my [expletive] name, Kim?" Jones testified that she met with defendant's lawyer before trial, and told her about her argument with the victim and about the victim's hand movements.

On cross-examination, Jones admitted that, although hours elapsed between the time the victim threatened her and the shooting, she did not call the police to report the threat. She also admitted that, when she spoke with the police after the shooting, she told them she did not know who had done it and she did not tell them the victim had threatened her. The next time she spoke to the police, she told them she had confronted the victim because she thought he was responsible for the break-in at her house and that he had threatened her. She further testified that somebody else was prosecuted for the break-in at her house. She also told them that, as defendant ran to his car after the shooting, she called him a "stupid bitch." Jones testified that, although she did not attend the first day of defendant's trial, she attended every other day and was not called as a witness in the trial.

Defendant's trial counsel, Public Defender Jean Herigodt, testified that she had defended hundreds of murder cases prior to representing defendant. Prior to filing defendant's answer of self defense in his murder trial, Herigodt interviewed witnesses, including Garrett and Jones. She met with both women in her office and read their police statements. She testified:

7

1-06-0788

"I considered both [Jones and Garrett] possible witnesses in this case. As the case

went on, I decided that the best strategy would be to keep them off the stand."

In her judgment, Herigodt believed that "there were more things that would detract from the case

if I put [Jones and Garrett] on the stand than would help support the case." Those factors

included the fact that the two women were admitted drug dealers, and she believed it might

appear to the jury that defendant shot the victim, a rival drug dealer, at their behest. Specifically,

putting Jones and Garrett on the stand would "give the State fertile ground to go into the drug

dealing [and drug trade] rivalry with the victim." This would focus the jury's attention on the

drug dealing as opposed to defendant's theory of self-defense, that defendant "just happened

along," heard of threats to his sister and sister-in-law, was concerned, and merely wanted to talk

with the victim. Herigodt testified that:

"I didn't want the focus being on the drug dealing as opposed to what [defendant]

believed. I thought I could limit that [by not having Jones and Garrett testify.]"

Herigodt testified that she was also concerned about having Jones and Garrett testify due

to possible inconsistencies regarding the victim's hand placement prior to the shooting.

Specifically, Herigodt testified that, because she argued at trial that the State's witnesses were

inconsistent, putting witnesses on the stand that had any inconsistency could be detrimental to the

credibility of the defense.

Furthermore, Herigodt testified that she did not call Garrett or Jones because the State

would have been able to further explore the prior incident in which Jones' home was robbed and

defendant's brother was shot, and noted that, although there were prosecutions in that crime, the

8

1-06-0788

victim was never named as the offender.

Herigodt testified that she requested and the court denied a continuance on the first day of trial to ensure the presence of Jones. She testified that Jones appeared on the second day of trial. Ultimately, in addition to the above reasons, Herigodt decided not to call Jones because she believed that calling her would waive certain hearsay issues on appeal regarding Jones' alleged post-shooting statement to the victim. She also believed that Jones' police statement in which she said she called defendant a "stupid bitch" following the shooting indicated that Jones did not believe the shooting was necessary, which would have detracted from both self-defense arguments and a mitigation to second degree murder. Herigodt believed that this prior statement would have detracted so much from the self-defense theory that "it wasn't worth the corroboration" she could get from Jones' testimony.

Herigodt further recalled that Garrett was "very concerned" about the ramifications of admitting that she owned the gun used in the shooting.

The trial court found that defendant did not meet his burden of proving any constitutional infirmities that occurred at trial or that rendered conviction improper, and denied his petition for relief. This appeal follows.

Analysis

Where, as here, a postconviction evidentiary hearing involves fact-finding and credibility determinations, we will only disturb the decision of the trial court where it is manifestly erroneous. People v. Pendleton, 223 Ill. 2d 458, 473 (2006). Manifest error is error that is clearly evident, plain, and indisputable. People v. Morgan, 212 Ill. 2d 148, 155 (2004).

9

1-06-0788

Here, we find no manifest error in the trial court's denial of defendant's postconviction claim that he was denied the effective assistance of trial counsel.

Defendant first argues that he was denied the effective assistance of trial counsel where counsel failed to present the testimony of Jones and Garrett to corroborate defendant's testimony that the victim reached toward his waistband prior to the shooting. We disagree.

To establish a claim of ineffective assistance of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that he was prejudiced by this deficient performance. Strickland v. Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v. Coulter, 352 Ill. App. 3d 151, 157 (2004). Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim. People v. Palmer, 162 Ill. 2d 465, 475-76 (1994). To satisfy the first prong, a defendant must overcome the presumption that contested conduct which might be considered trial strategy is generally immune from claims of ineffective assistance of counsel. People v. Martinez, 342 Ill. App. 3d 849, 859 (2003). To establish prejudice, a defendant must show there is a reasonable probability that, but for counsel's insufficient performance, the result of the proceeding would have been different. People v. Easley, 192 Ill. 2d 307, 317 (2000). Specifically, the defendant must show that counsel's deficient performance rendered the result of the proceeding unreliable or fundamentally unfair. Easley, 192 Ill. 2d at 317-18.

Counsel's decision regarding whether to present a particular witness is generally a matter of trial strategy, which enjoys a strong presumption that it is the product of sound trial strategy and not incompetence, and will not support a claim of ineffective assistance of counsel. People v. Enis,

10

1-06-0788

194 Ill. 2d 361, 378 (2000). However, counsel may be deemed ineffective for failure to call a witness who could corroborate an otherwise uncorroborated defense. People v. Brown, 336 Ill. App. 3d 711, 718 (2002).

Here, defendant fails to overcome the presumption that counsel's actions were a product of sound trial strategy. See Enis, 194 Ill. 2d at 378. Defendant asserts that counsel should have called Jones and Garrett to testify in order to corroborate defendant's statement. We find counsel's representation reasonable where, as counsel testified at the evidentiary hearing, after interviewing both Jones and Garrett and reviewing their police statements, she concluded that their testimony would harm rather than help defendant's case. Both women are admitted drug dealers who were rival dealers of the victim. Prior to the shooting, both Jones and Garrett argued with the victim regarding control of the drug sales around Austin Town Hall Park. Counsel determined that the jury, after hearing Jones' and Garrett's testimony, might believe that defendant was procured to shoot the victim in order to eliminate a rival drug dealer, rather than believe that defendant was merely passing by the neighborhood, heard that the victim had threatened his sister and sister-in-law, and approached the victim to talk. Moreover, counsel believed that the jury might interpret the fact that Jones called defendant "stupid bitch" immediately following the shooting as an indication that she did not believe defendant acted in self-defense.

It was reasonable for counsel not to call Garrett or Jones at trial, where they would have been subjected to cross-examination which would likely have elicited further evidence to bolster the State's theory that defendant shot the victim in order to help his sister's and sister-in-law's drug dealing business by eliminating the competition. Therefore, the postconviction court's

1-06-0788

decision was not against the manifest weight of the evidence. See Pendleton, 223 Ill. 2d at 473.

Moreover, defendant's argument fails because he is unable to show resulting prejudice. Two trial witnesses testified that they observed the victim raise his hands moments before defendant shot him. Defendant admitted that he shot the victim "right away," and then he fled to another state. We cannot say that counsel's decision not to present the testimony of Jones and Garrett, the rival drug dealers who instigated defendant's confrontation with the victim and gave him the gun he used, rendered the proceedings unreliable or fundamentally unfair. See Easley, 192 Ill. 2d at 317-18.

Defendant's reliance on People v. King, 316 Ill. App. 3d 901 (2000), for the proposition that "there is no sound trial strategy in failing to call available witnesses who would have bolstered an otherwise uncorroborated defense" does not persuade us differently. In King, the postconviction court held an evidentiary hearing regarding whether trial counsel was ineffective for failing to call an alibi witness. King, 316 Ill App. 3d at 905. At the evidentiary hearing, the defense attorney gave no reason for his decision not to call the sole alibi witness. King, 316 Ill App. 3d at 916. In reversing and remanding the cause for a new trial, we stated:

> "Because [trial counsel] failed to provide any explanation at the evidentiary hearing
> and because we cannot conceive of any sound trial strategy that would justify
> counsel's failure to call an available alibi witness who would have bolstered an
> otherwise uncorroborated defense, we find that [trial counsel's] failure to call [the
> lone alibi witness] was the result of incompetence." King, 316 Ill App. 3d at 916.

That is not the case here, where defense counsel clearly testified at the evidentiary hearing

1-06-0788

regarding the factors that went into her strategic decision not to call Jones and Garrett to testify. Unlike King, here we are able to conceive of sound trial strategy to justify counsel's decision not to call Jones and Garrett – namely, that calling them would have bolstered the State's theory that defendant shot the victim in an effort to aid his sister-in-law's drug-dealing business.

Next, defendant contends he was deprived of the effective assistance of trial counsel where counsel failed to object to evidence that defendant used an alias when he was arrested and had used other aliases in the past. Specifically, defendant argues that the State used this evidence "to call attention to [defendant's] previous interactions with the police and to label him a liar." Defendant concedes that the State's questioning regarding his use of an assumed name upon arrest in the instant matter was not error, as the use of a false name after the commission of a crime may be relevant on the issue of consciousness of guilt. See People v. Harris, 225 Ill. 2d 1, 23 (2007); People v. Coleman, 158 Ill. 2d 319, 339 (1994). However, defendant contends that the State's further questioning regarding defendant's use of two other aliases was error. He also asserts that his appellate counsel was ineffective for failing to raise this issue on direct appeal. We disagree.

Generally, trial strategy encompasses counsel's decision whether to object to particular testimony. People v. Martinez, 348 Ill. App. 3d 521, 538 (2004). Even where evidence is clearly inadmissible, incompetent representation is not established by the mere failure of counsel to object to such evidence. Martinez, 348 Ill. App. 3d at 538. Moreover, a defendant is entitled to competent, not perfect, representation. People v. Murphy, 72 Ill. 2d 421, 438 (1978).

Where a defendant testifies on his own behalf, it is proper to question him regarding his use of assumed names if proof of the assumed names is offered into evidence and shown to be material.

13

1-06-0788

People v. Pumphrey, 51 Ill. App. 3d 94, 99 (1977).

Here, the postconviction court's denial of defendant's claim that trial counsel was ineffective for failure to object to testimony regarding his assumed names was not manifestly erroneous where defendant has failed to show he was prejudiced by the admission. The questioning at issue is as follows:

"STATE: Q: By the way, what's your name?

DEFENDANT: A: Tobias Garrett.

Q: Now, when you were in Wisconsin your name was James Hackman, right?

A: Yes.

Q: So that's not really your name?

A: No.

Q: So you were lying when you said that was your name, right?

A: Yes.

Q: And you've lied about your name before, right?

A: Yes.

Q: When you talked to Officer Farrell you told him your name was Tobias Jones back in 1997, right?

A: Yes.

Q: Prior to that time you used the name Cortis Sorrells to an Officer Sutherland?

A: Yes."

Q: And you were lying when you used that name, right?

14

1-06-0788

    A: Yes."

Later, the State entered certified copies of three prior convictions for (1) delivery of a controlled

substance within one thousand feet of a school, park, or church; (2) possession of a controlled

substance; and (3) take and drive a vehicle without consent. The court instructed the jury to

consider these only for the issue of defendant's "believability as a witness." The State did not

specify whether these were the instances in which defendant had used assumed names.

    That defendant used a false name upon arrest for the instant crime was properly before the

jury. See Harris, 225 Ill. 2d at 23. This had already impeached his credibility with the jury, and

the further evidence that defendant had used a false name on two prior occasions was harmless, as

it merely reflected upon his already suspect credibility. No other crimes evidence was exposed

through this line of questioning, and the State did not dwell on the aliases at trial. We find that the

postconviction court's denial of defendant's claim that he was prejudiced by the admission of

testimony regarding his assumed names was not against the manifest weight of the evidence.

    Because defendant has failed to demonstrate that trial counsel was ineffective for failing to

object to this testimony, we conclude that appellate counsel's failure to raise the issue on direct

appeal did not amount to ineffective assistance of counsel. People v. Caballero, 126 Ill. 2d 248,

270 (1989).

    Lastly, defendant contends that trial counsel was ineffective for failing to introduce

evidence that defendant is right-handed. Specifically, defendant argues that evidence of

defendant's right-handedness would have cast doubt on Davis' credibility, who testified that

defendant approached the victim with his hand in his left pocket before drawing his gun. We

15

1-06-0788

disagree.

Evidence at trial showed that defendant shot the victim after talking with his sister and sister-in-law, who were enmeshed in an argument with the victim regarding drug-dealing turf. Three witnesses, Davis, Green, and Campbell, testified that defendant shot the victim. Defendant admitted having shot the victim. Green testified that the victim "threw his hands up" before being shot, and Campbell testified that defendant approached the victim and shot him. Davis testified in line with Green and Campbell, with the addition that defendant's left hand was in his pocket as he approached the victim. We fail to see how, but for the lack of evidence presented regarding defendant's handedness, the result of the proceeding would have been different. As such, defendant has not shown that he was prejudiced by any alleged ineffective assistance of counsel. Therefore, the postconviction court's denial of defendant's ineffectiveness claim for failure to introduce this evidence was not against the manifest weight of the evidence. See Easley, 192 Ill. 2d at 317; Pendleton, 223 Ill. 2d at 473.

We are not persuaded differently by defendant's argument that the jury question inquiring whether defendant was left- or right-handed during jury deliberations demonstrates that the jury was "struggling with [Davis'] credibility" and, "if counsel had shown that [defendant] is right-handed, the jury would have likely concluded that [Davis'] testimony should not be credited." Defendant's assertions are unsupported conclusions. We have no way of knowing what prompts a jury to ask a particular question during deliberations, and certainly no way of predicting that a jury will reach a particular decision based upon the evidence before it, and we will not attempt to do so.

For the foregoing reasons, the decision of the circuit court of Cook County is affirmed.

16

1-06-0788

Affirmed.


FITZGERALD SMITH, P.J., with GALLAGHER and O'MARA FROSSARD, JJ.,

concurring.

STATE OF ILLINOIS    )
                     )    SS
COUNTY OF COOK       )

## AFFIDAVIT

I, Kimberly Jones, state under oath, and under penalty of perjury, on information and belief, as follows:

1. My date of birth is August 15, 1973. I have been working as a certified nursing assistant for a number of years.

2. I was previously in a 12-year relationship with Tobias Garrett's brother. We no longer have a relationship.

3. I was available to testify at Tobias Garrett's trial in 2001. I came to court for trial and was excluded from the courtroom. Tobias Garrett's attorney, Ms. Herigodt, had indicated that I would be testifying, and prepared me to testify at her office. During the trial, I asked her why I could not go in the courtroom, and she said it was because I could be a witness. Later, I asked the attorney why I didn't testify, and the attorney said that Tobias had testified to everything that happened and that my testimony would not be needed.

4. If I had been called to testify at Tobias's trial, I would have testified to the following:

a.. Earlier that day, Johnson got a gun out of his trunk and showed it to me and Niki Garrett during an argument. In arguing about the incident when Chandus was shot, he said wait til next time. When Tobias came, we told him about the argument.

b. When Tobias left in the car and drove around to Parkside, I walked over to the Austin Town Hall Park and at the time of the shooting I was east of the basketball court where Johnson was playing, between the library and the field house. Tobias hollered out to Johnson

EXHIBIT

"let me holler at you." Johnson called out that it was over with, but at the same time, he put his hand under his t-shirt by the waistband, as though he had a gun there. After that, Tobias fired. Johnson did not raise his arms.

      c. I would have testified that I first told the police I did not see the shooting because I was afraid of being involved, and right away I began staying with family on South Michigan.

      d. After the shooting, I did not say, "What's my motherfucking name, Kim," as Latrice Davis testified. I yelled at Tobias for shooting.

      5. I told Ms. Herigodt about the facts in paragraphs 4a, 4b and 4c. She did not ask me if I had said, "What's my motherfucking name, Kim."

      6. I am signing this affidavit of my own free will, and was not influenced by either promises nor threats.

      Further affiant sayeth not.

Kimberly Jones

Signed and Sworn to before me
this 20th day of June, 2005

Notary Public

"OFFICIAL SEAL"
PAMELA PRUDENT
Notary Public, State of Illinois
My Commission Expires July 19, 2006

STATE OF ILLINOIS )
                     ) SS

COUNTY OF COOK )

## AFFIDAVIT

I, Niki Garrett, state under oath, and under penalty of perjury, as follows:

1. I am Tobias Garrett's sister. My date of birth is March 25, 1976.

2. I was available to testify at Tobias Garrett's trial in 2001. I came to court for his trial and was present every day.

3. Tobias Garrett's trial attorney never prepared me to testify and I was never told that I would testify.

4. If I had been called to testify at Tobias Garrett's trial, I would have testified to the following:

a. The afternoon of the shooting, on Central Avenue, Johnson (Lil Lord) displayed a gun to me, put it to my face, and said somebody was going to die tonight. Kim Jones was present. I believe that he meant us because Kim and he had been arguing earlier. Later, when Tobias came, I told Tobias about Johnson's threats, so Tobias said he was going to talk to him and left in a car, taking with him Kim's gun for protection.

b. When Tobias left in the car, I was within Austin Town Hall Park, east of the basketball court, closer to Central than Parkside but with an unblocked view of the court.

c. I heard Tobias call out to Johnson, who was on the basketball court. Johnson turned around with his hand inside his t-shirt, from underneath, at the waist. It was after that that Tobias fired the shots. I did not see Johnson raise his hands over his head before being shot.

d. When the shots were fired, I immediately left the park.

5. I am signing this affidavit of my own free will, and no one made any threats or promises to me.

Further affiant sayeth not.

_Niki Garrett_

Signed and Sworn to before me

this 10th day of May, 2005

_Notary Public_

OFFICIAL SEAL
MONIQUE P. HODGES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-3-2007

EXHIBIT

STATE OF ILLINOIS        )
                                  )    SS

COUNTY OF WILL        )

### AFFIDAVIT

       I, Tobias Garrett, state under oath, and under penalty of perjury, on information and belief, as follows:

       1. I am the post-conviction petitioner in No. 00 CR 17163.

       2. When Latrice Davis testified that I had my hand in my left pocket on walking toward Johnson, I notified both of my attorneys that I was right-handed.

       3. When I testified, I was not asked to confirm that I was right-handed.

       Further affiant sayeth not.

*Tobias Garrett*

Signed and Sworn to
before me this 15ᵗʰ
day of ~~May,~~ June 2005

*Crystal L. Mason*
Notary Public

```
"OFFICIAL SEAL"
Crystal L. Mason
Notary Public, State of Illinois
My Commission Exp. 11/10/2008
```

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

FIRST DIVISION
August 4, 2003

No. 1-01-3378

## IN THE APPELLATE COURT OF ILLINOIS
## FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 00 CR 17163 |
| TOBIAS GARRETT, | ) | The Honorable James B. Linn, Judge Presiding. |
| Defendant-Appellant. | ) | |

### ORDER

Following a jury trial, defendant Tobias Garrett was convicted of first degree murder and sentenced to 30 years in prison, later modified to a 28-year sentence. On appeal, defendant contends that his conviction should be reduced from first degree murder to second degree murder because the evidence demonstrates that at the time of the offense, he possessed the subjective, although erroneous, belief that the use of deadly force was necessary. We affirm.

The following facts are undisputed. On the evening of July 22, 1999, defendant drove to Austin Town Hall park in Chicago in a green Pontiac Bonneville in order to visit with his sister-in-law, Kim Jones. Jones was also the legal guardian of Chandus Ousley, defendant's brother. The park was roughly the size of a

city block and featured a basketball court.  The victim Richard
Johnson and Jones both dealt narcotics in the area and earlier
that day, the two had argued because Jones' sales were infringing
on the victim's turf.  After speaking with Jones that evening,
defendant approached the victim on the basketball court and shot
him twice, wounding him fatally.  Defendant sustained a gunshot
wound to the left chest, below the armpit and a second gunshot
wound to the back of his left calf.

State's witness Latrice Davis testified that at
approximately 7 p.m., the victim walked up to her while she was
sitting on the hood of a car parked alongside Austin Town Hall.
The two began to converse.  Davis testified that the victim was
wearing a white tee-shirt and jeans.  Davis also saw Jones and an
unidentified woman walking across the park towards the victim.
Upon seeing Jones and her friend walking towards them, the victim
stated, "here come them [expletive]," and "it's about to be some
trouble."  Around the same time, Davis observed a green Pontiac
Bonneville slowly drive by.  Defendant, who was driving the
vehicle, looked at Davis and the victim and then drove on.  In
response, the victim left Davis and walked towards the basketball
court, where a number of men were in the midst of a game.  Davis
saw defendant make a U-turn and park his car approximately two to
three cars behind the car on which she was sitting.  According to
Davis' testimony, the defendant exited his vehicle and strode
towards the victim with his hands in his pocket.  When defendant

2

was five feet away from the victim, the victim put his hands "over [his] head spread out in a surrender position." Davis saw defendant draw a gun and fire two shots at the victim. The second shot was fired after the victim had turned to run. Defendant then walked back to his car and drove off. Davis further testified that after the victim was shot, Jones began to sing a song which went, in part, "What's my [expletive] name? Kim."

On cross-examination, Davis was impeached by her prior inconsistent statement to an assistant State's Attorney affirming that she had known the victim "like all my life." When initially interviewed by the police, Davis did not inform them that the victim had thrown up his hands shortly before being shot. The evidence also established that the victim was wearing jogging pants, not jeans, at the time of his death.

At trial, Robert Green corroborated Davis' testimony that the victim had raised his arms in a surrender position upon being approached by defendant. Prior to the shooting, Green overheard the victim saying that he and Jones had gotten into an argument.

Willie Campbell's testimony also identified defendant as the shooter. Campbell, a convicted drug offender, had earlier observed the argument between Jones and the victim and denied that the victim had threatened Jones. Campbell further testified that he saw defendant arrive at the park in a green Pontiac Bonneville. At that time, the victim was not present. Defendant

3

exited his car and briefly spoke with Jones and her friend, who
pointed at Campbell.   Defendant then walked towards Campbell and
inquired, "where is dude at?"   Campbell said that the victim was
gone and defendant walked back to Jones and her friend.   After
the three spoke for about 10 minutes, defendant drove away.
Thereafter, defendant returned and parked his car.   The victim
was now at the park and standing on the basketball court.
Defendant approached the victim and shot him.   On cross-
examination, Campbell revealed that he helped the victim sell
drugs on Central, which abutted the park.

Defendant testified that he drove to the park on July 22,
1999, in a rented green Pontiac Bonneville in order to visit with
Jones.   Jones subsequently told defendant that she had been
arguing with a man who had pulled a gun on her and stated that he
was going to "kill somebody tonight, when tonight come."
Defendant then drove his car around the block, looking for Jones'
assailant.   Defendant parked after briefly searching to no avail.
Defendant spoke again with Jones, as well as his sister Niki
Garrett, about the alleged threats.   At this point, Jones saw
Campbell and informed defendant that Campbell was a friend of the
man who had threatened her.   Campbell told defendant that the
victim was not present.   Based on his conversations with Jones
and Garrett, defendant concluded that the victim planned to
return to the park at nightfall and murder Jones.   Some time
later, Jones saw the victim and pointed him out to defendant.

4

Motivated by fear, defendant grabbed Garrett's purse and removed
a gun, which he placed in his pocket. Defendant testified that
he understood that "something would probably happen *** when I go
over here [sic] to talk to him." Defendant reentered his car and
drove a short distance towards the victim's location. After
parking, defendant told a friend to stay in the car so that the
victim would not misinterpret defendant's intent. As defendant
walked towards the victim, a group of defendant's friends pulled
up in a car and informed defendant that the victim had just come
looking for him. Defendant told his friends to hold on, because
he wanted to briefly speak with the victim. Upon entering the
basketball court, defendant stated to the victim, "hey man,
what's up. Come here." Before defendant was able to indicate
that he simply wanted to talk, the victim turned his back to him
and reached into his pants. Defendant mistakenly believed that
the victim was reaching for a firearm. In fear for his life,
defendant drew his gun and started shooting. Defendant testified
that he never actually saw the victim wield a gun. After the
incident, defendant fled to Racine, Wisconsin.

Defendant was impeached by the written statement he prepared
with the police. In that statement, defendant did not mention
that he had learned from Jones that the victim was threatening
her. Defendant, however, testified that he had relayed this
information to the police, but they did not write it down.

Defendant also introduced the testimony of police officer

5

Hayad, which established that Jones' apartment had been broken into in May 1999. According to defendant's testimony, his brother Ousley was shot during the drug-related burglary. On cross-examination, defendant conceded that the victim had never been implicated in that crime.

After the close of evidence, in addition to an instruction on first degree murder, the jury was given instructions on self-defense and second degree murder. Defendant was subsequently found guilty of first degree murder. Defendant was sentenced to 30 years in prison, later modified to a 28-year prison term.

On appeal, defendant asserts that the evidence demonstrates that he subjectively believed that his use of deadly force was necessary to avert his own death or great bodily harm. Consequently, defendant contends that his conviction should be reduced to second degree murder.

Supreme Court Rule 615(b)(3) authorizes a reviewing court to reduce the degree of the offense of which a defendant is convicted. 134 Ill. 2d R. 615(b)(3). On direct appeal, we may reduce a conviction of first degree murder to second degree murder upon determining that the defendant proved at trial, by a preponderance of the evidence, that he believed the circumstances surrounding the offense justified using self-defense, but this belief was unreasonable. People v. Hawkins, 296 Ill. App. 3d 830, 838 (1998). This power, however, should be "'cautiously exercised.'" People v. Rodriquez, 336 Ill. App. 3d 1, 17-18

6

(2002), quoting People v. Hooker, 249 Ill. App. 3d 394, 403 (1993).

When a defendant challenges the sufficiency of the evidence supporting his conviction, the reviewing court must determine whether any rational trier of fact could have found the requisite elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution. People v. Hopkins, 201 Ill. 2d 26, 40 (2002). The trier of fact is solely responsible for assessing witness credibility, drawing reasonable inferences from the testimony and resolving testimonial conflicts. People v. Ortiz, 196 Ill. 2d 236, 259 (2001).

A person commits first degree murder when he, without legal justification, kills an individual with the intent to kill or do great bodily harm to the victim, or knowledge that his acts will result in the victim's death, or knowledge that his actions create a strong probability of death or great bodily harm to the victim. 720 ILCS 5/9-1(a)(1), (a)(2) (West 1998).

Once the State has proven first degree murder, a defendant may reduce the offense to second degree murder if he demonstrates by a preponderance of the evidence that he believed that the killing was justified by self-defense, but that belief was unreasonable. 720 ILCS 5/9-2(a)(2) (West 1998). If self-defense is successfully raised, the State must establish beyond a reasonable doubt that the defendant did not act in self-defense.

People v. Bryant, 325 Ill. App. 3d 448, 453 (2001).

Self-defense is established by evidence that: (1) unlawful force was threatened against the defendant; (2) the danger of harm was imminent; (3) the defendant was not the aggressor; (4) the defendant subjectively believed that a danger existed; and (5) the defendant's use of deadly force was necessary to avert the harm. Bryant, 325 Ill. App. 3d at 453.

We find that defendant did not prove by a preponderance of the evidence that his decision to shoot the victim was motivated by an actual belief that such action was necessary to avert an imminent harm. This case hinges on the discrepancy between defendant's testimony and that of Davis and Green regarding what occurred immediately prior to the shooting. Defendant testified that the shooting was precipitated when the victim turned away and reached into his jogging pants, causing defendant to mistakenly believe that the victim was attempting to draw a firearm. By contrast, Davis and Green each testified that the victim merely raised up his arms in a surrender position when approached by defendant. Testimonial conflicts are appropriately resolved by the trier-of-fact. Here, the jury was instructed on both self-defense and the lesser mitigated offense of second degree murder. The jury's finding of first degree murder clearly demonstrates that it concluded that Davis' and Green's account was more credible than defendant's. See also People v. Luke, 253 Ill. App. 3d 136, 141 (1993) (a trier-of-fact may give testimony

8

less weight in light of its self-serving character). When
viewing the evidence in the light most favorable to the
prosecution, we cannot conclude that this finding was in error.
Defendant's claim that he subjectively believed that the use of
deadly force was justified accordingly fails. It is exceedingly
unlikely that defendant felt mortal fear upon confronting an
unarmed man whose arms were raised in submission or surrender.
Thus, the mitigating factor of imperfect self-defense was not
established by a preponderance of the evidence at trial.

Defendant seeks to diminish this infirmity by arguing that
the evidence amply demonstrates the victim's "violent
disposition." According to defendant, his state of mind at the
time of the offense was guided by the victim's alleged threats to
Jones, the May 1999 shooting of Ousley, and the victim's
reputation as a drug dealer. This argument is spurious. First,
defendant's testimony admitted that the victim had never been
implicated in the May 1999 incident. Second, the objective
manifestation of defendant's state of mind, his actual conduct,
belies his claim that he feared for his life. It was defendant
who initiated contact with the victim, intercepting him at the
basketball courts. Defendant approached the victim alone,
despite arriving at the park with a friend and being warned by a
car full of additional friends that the victim was looking for
him. Defendant also conceded that he believed "something" would
happen if he decided to talk to the victim. Rather than leave

9

the park, defendant instead chose to escalate the situation by confronting the victim.  Defendant's actual conduct does not connote a fearful apprehension but is instead consistent with an intent to instigate or provoke.

In conclusion, the mitigating factor of imperfect self-defense is not established by a preponderance of the evidence where a defendant acts in a manner entirely inconsistent with mortal fear, approaches an unarmed man whose arms are raised in surrender, and shoots him once in the chest and once after he has turned to run away.  Cf. Hawkins, 296 Ill. App. 3d at 837-38 (the court found that the defendant had an actual, but unreasonable belief that self-defense was justified in light of evidence that just before the killing occurred, the victim punched the defendant in the head, threw a brick at the defendant, prevented defendant from fleeing, and stated, "I'm goin' kill you").

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

SMITH, J., with McNULTY and O'MALLEY, JJ., concurring.

10