UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ex rel. TOBIAS GARRETT ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> GERARDO ACEVEDO, Warden, ) <br> ) <br> Respondent. ) | No. 08 C 2544 <br><br> Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

Illinois prisoner Tobias Garrett ("Petitioner") is serving a 28-year sentence for first degree murder. He has filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition"), raising claims of ineffective assistance of counsel and other claims. (R. 1, Petition.) Warden Gerardo Acevedo[1] ("Respondent") argues that Petitioner's claims fail on the merits, are not cognizable in this proceeding, or are procedurally defaulted. (R. 16, Answer.) For the reasons stated below, the Petition is denied.

### RELEVANT FACTS[2]

#### A. Trial Proceedings

On the evening of July 22, 1999, Petitioner drove to Austin Town Hall Park in Chicago to

---

[1] At the time he filed the Petition, Petitioner was housed at Stateville Correctional Center. (R. 1, Petition.) He has since been transferred to Hill Correctional Center, and this Court has accordingly substituted Gerardo Acevedo, the warden at Hill, as the proper respondent in this case. *See Dalton v. Battaglia*, 402 F.3d 729 (7th Cir. 2005).

[2] The facts are taken from the Petition and portions of the state court record Respondent has provided pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts.

1

visit his sister-in-law, Kim Jones ("Jones"). (R. 1, Petition, Ex. 1, *People v. Garrett*, No. 1-06-0788 (Ill. App. Ct. Oct. 19, 2007) at 2.) Jones was married to Petitioner's brother and was also the legal guardian of Petitioner's younger brother. (*Id.*) Jones and Petitioner's sister, Niki Garrett ("Niki") sold drugs in the Austin area, as did the victim, Richard Johnson ("Johnson"). (*Id.*) Jones and Johnson had argued earlier that day because Jones' drug sales were infringing on Johnson's territory. (*Id.*) Jones told Petitioner about her argument with Johnson, and said Johnson had pulled a gun on her saying he was going to "kill somebody tonight." (*Id.* at 3.)

At trial, several eyewitnesses testified to what occurred next. Latrice Davis ("Davis") testified that she spoke with Johnson near the park at approximately 7 p.m. and that Johnson said, "[I]t's about to be some trouble" when he saw Jones and an unidentified woman approaching. (*Id.* at 2.) Davis also observed Petitioner driving by slowly in a green Bonneville. (*Id.*) Petitioner looked at her and Johnson and then drove on. (*Id.*) Johnson then left Davis and walked toward the basketball court. (*Id.*) Davis testified that she saw Petitioner make a U-turn, park his car, and get out and walk toward Johnson with his left hand in his pocket. (*Id.*) When Petitioner was approximately five feet away from him, Johnson put his hands "over [his] head spread out in a surrender position." (*Id.*) Davis testified that she saw Petitioner draw a gun and shoot Johnson, and when Johnson turned to run, Petitioner fired a second shot. (*Id.* at 2-3.) The state introduced medical evidence showing that Johnson was shot once in the chest and once in the back of the leg. (R. 17, Record, Ex. C at 2.)

Another eyewitness, Robert Green ("Green"), corroborated Davis' account. (R. 1, Petition, Ex. 1 at 3.) Green testified that prior to the shooting he overheard Johnson say he and Jones had argued earlier that day. (*Id.*) Green testified that Johnson "threw his hands up" right

2

before he was shot.[3] (*Id.*) Willie Campbell ("Campbell"), a third eyewitness, testified that he saw the argument between Jones and Johnson, and claimed they were arguing about Jones selling drugs in the area, but he denied Johnson had threatened Jones. (*Id.*) Campbell testified to seeing Petitioner arrive at the park and speak with Jones and her friend. (*Id.*) He later saw Petitioner approach Johnson on the basketball court and shoot him. (*Id.*)

Petitioner testified in his own defense, claiming that he thought Johnson was planning to return to the park later that night to murder Jones. (*Id.*) He testified that he took a gun from Niki's purse and put it in his pocket because he thought "something would probably happen [] when I go [] talk to him." (*Id.* at 3-4.) Petitioner testified that he entered the basketball court and said to Johnson, "[H]ey man, what's up. Come here." (*Id.*) Petitioner testified that he saw Johnson reach into his pants and mistakenly believed he was reaching for a firearm. (*Id.*) He testified that he drew his gun and started shooting. (*Id.*) Petitioner claimed that although he never actually saw Johnson draw a gun, he was in fear for his life when he shot Johnson. (*Id.*)

On cross-examination, Petitioner admitted that after the shooting he threw the gun in a lake, fled to Wisconsin, and began using the alias "James Hackman." (R. 17, Record, Ex. L, Trial Tr. at 159.) He also admitted using the aliases "Tobias Jones" and "Curtis Sorrells" in the past. (*Id.* at 159-60.) He further admitted that when he first spoke to police following the shooting, he told them that he had not been on the west side of Chicago since 1996 and that he had not shot anyone. (*Id.*) In a written statement Petitioner later gave to police in which he admitted shooting Johnson, he made no mention of Johnson having threatened Jones. (*Id.* at

---

[3] At trial, Green demonstrated Johnson's action, and the trial court characterized the movement as "hands stretched outward, the palms extended and facing forward . . . below the shoulders." (R. 17, Record, Ex. L at 79.)

3

177.) Petitioner testified that he told the police about the threat but they left this information out of the statement; he admitted he had been given an opportunity to make additions to the statement and had signed it as written. (*Id.*) Following Petitioner's testimony, the state offered evidence showing that he had three prior convictions for delivery of a controlled substance, possession of a controlled substance, and taking a vehicle without consent. (R. 1, Petition, Ex. 1 at 15.)

At the close of the evidence, the jury was instructed on the elements of first degree murder, as well as the elements of self-defense and second degree murder. (R. 17, Record, Ex. C at 6.) On June 20, 2001, the jury found Petitioner guilty of first degree murder. (*Id.*) Petitioner was sentenced to 30 years in prison, which the trial court later reduced to 28 years. (*Id.*) He appealed, arguing that his conviction should be reduced to second degree murder because he believed that use of deadly force was necessary to avert his own death or great bodily injury. (R. 17, Record, Ex. A.) The appellate court affirmed Petitioner's conviction and sentence. (*Id.*, Ex. C.) Petitioner filed a *pro se* petition for leave to appeal ("PLA") to the Illinois Supreme Court, which was denied. (*Id.*, Ex. D-E.)

### B. Post-Conviction Proceedings

On March 3, 2004, Petitioner filed a *pro se* post-conviction petition in state court, and was subsequently appointed counsel to represent him. (R. 1, Petition, Ex. 1 at 5.) With the help of counsel, Petitioner filed a supplemental post-conviction petition, arguing that he received ineffective assistance of counsel on numerous grounds, including: (1) trial counsel was ineffective for failing to call witnesses to corroborate his self-defense theory; (2) trial and appellate counsel were ineffective for failing to challenge the admission of evidence pertaining to

4

Petitioner's use of aliases; and (3) trial counsel was ineffective for failing to introduce evidence that Petitioner was right-handed, which would have cast doubt on Davis' testimony that Petitioner had approached Johnson with his left hand in his pocket. (*Id.*)

On February 23, 2006, an evidentiary hearing was held. (*Id.*) At the hearing, Petitioner's sister Niki testified that she met with Public Defender Jean Herigodt ("Herigodt") prior to trial, was subpoenaed and came to court each day of the trial, but was never called to testify. (*Id.*) She testified that on the day of the shooting, Johnson showed her a gun and threatened to kill her. (*Id.*) After Niki relayed the threat to Petitioner, Petitioner and Jones went to the park and found Johnson. (*Id.* at 5.) Niki testified that Petitioner yelled and Johnson turned around with his hands under the front of his shirt. (*Id.*) She testified that Johnson "kept fumbling with his shirt," and did not raise his hands into the air prior to Petitioner shooting him. (*Id.* at 6.) On cross-examination, Niki admitted that at the time of the shooting, she was helping Jones sell drugs, and that she had argued with Johnson about who could sell drugs in the area. (*Id.*) She also admitted that she did not call the police to report the alleged threat Johnson made to her several hours before the shooting. (*Id.*)

Jones also testified at the hearing, corroborating Niki's account that Johnson did not raise his hands in surrender before the shooting. (*Id.* at 7.) Jones testified that earlier that day Johnson showed her a gun and threatened her, saying, "[I]f the [expletive] came to your house last time and didn't nobody die, the next time we come back, somebody going to die." (*Id.* at 6.) Jones understood the threat to mean that Johnson was responsible for a robbery at her home a few weeks earlier, in which Petitioner's brother had sustained a gunshot wound. (*Id.*) Jones testified that she was about 50 feet from Petitioner and Johnson at the park, and could see them clearly.

(*Id.* at 7.) She testified that Petitioner and Johnson were talking when Johnson reached into his pants "as if he was reaching for something" and Petitioner shot him. (*Id.*) Jones testified that she met with Petitioner's attorney before trial and told her about Johnson reaching into his pants prior to the shooting. (*Id.*)

On cross-examination, Jones admitted that she did not call the police to report Johnson's threat. (*Id.*) She also admitted that when she spoke with the police after the shooting, she told them she did not know who was responsible for the shooting and did not tell them Johnson had threatened her. (*Id.*) The next time she spoke with the police, she told them she had confronted Johnson because she thought he was responsible for the robbery at her house. (*Id.*) Jones admitted that someone else had been prosecuted for the robbery. (*Id.*) Jones also admitted that after the shooting, she said to Petitioner, "What did you just do? You just F-ed up where I got to stay at." (*Id.*) She also admitted calling Petitioner a "stupid bitch" as he ran to his car after the shooting. (*Id.*)

Petitioner's trial attorney, Herigodt, also testified at the evidentiary hearing. (*Id.*) She testified that she had defended hundreds of murder cases prior to representing Petitioner. (*Id.*) She testified that she interviewed Niki and Jones prior to trial, and considered them possible witnesses, but as the case went on she decided "the best strategy would be to keep them off the stand." (*Id.* at 8.) Herigodt believed "there were more things that would detract from the case if I put [Jones and Niki] on the stand than would help support the case." (*Id.*) Specifically, Herigodt believed that since both Jones and Niki were admitted drug dealers, this would bolster the state's theory that Petitioner shot Johnson, a rival drug dealer, at their behest. (*Id.*) Herigodt was also concerned about Jones and Niki testifying because of apparent inconsistencies in their

accounts regarding Johnson's hand placement just prior to the shooting. (*Id.*) Herigodt felt that putting on witnesses with possibly inconsistent testimony could hurt Petitioner's credibility, since Herigodt was arguing at trial that the State's witnesses were inconsistent. (*Id.*) Herigodt also explained that she did not call Jones or Niki because it would have allowed the State to further explore the circumstances surrounding the robbery in Jones' home where Petitioner's brother was shot. (*Id.*) Additionally, Herigodt believed that calling Jones would waive certain hearsay issues regarding Jones' "stupid bitch" comment to Petitioner following the shooting. (*Id.* at 9.) In Herigodt's view, this comment demonstrated Jones' belief that the shooting was unnecessary, which would have undercut Petitioner's self-defense theory. (*Id.*) Herigodt also recalled that Niki had been "very concerned" about the ramifications of admitting on the stand that she owned the gun used in the shooting. (*Id.*)

On March 15, 2006, the trial court denied Petitioner's post-conviction petition. (R. 1, Petition, Ex. 1 at 1.) Petitioner then appealed to the Illinois Appellate Court, which affirmed. (*Id.*) The appellate court held that Herigodt's decision not to call Jones and Niki was sound trial strategy, and further, that Petitioner was not prejudiced by this decision given the other evidence in the case. (*Id.* at 11-12.) The appellate court also determined that Petitioner was not prejudiced by Herigodt's failure to object to testimony regarding his use of aliases, or by Herigodt's failure to introduce evidence of Petitioner's right-handedness. (*Id.* at 13, 16.) Petitioner filed a PLA to the Illinois Supreme Court, which was denied. (*Id.*, Ex. J, K.)

## PROCEDURAL HISTORY

On May 5, 2008, Petitioner filed the instant petition with this Court. (R. 1, Petition.) In Claims 1-3, he raises ineffective assistance claims based on counsel's failure to: call

7

eyewitnesses to testify on his behalf; object to questions about his use of aliases; and introduce evidence that he is right-handed. He raises two additional claims, which he describes as follows: Claim 4, that "the state court failed to prove Petitioner was guilty beyond a reasonable doubt of first degree murder" and therefore his conviction "should be reduced to second degree murder"; and Claim 5, that his sentence "does not conform to a statutory requirement under [] Illinois and United States [law]." (*Id.* at 7-8).

Respondent argues the Petition should be denied because the ineffective assistance claims fail on the merits, and the remaining claims are either not cognizable in this proceeding or are procedurally defaulted. (R. 16, Answer at 13-25.) Petitioner has filed a reply, arguing that relief is warranted on the ineffective assistance of counsel claim pertaining to counsel's failure to call witnesses. (R. 22, Petitioner's Reply at 1-5.)

## LEGAL STANDARDS

This Petition is governed by the provisions of the Anti-Terrorism and Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court can only grant an application for habeas relief if it meets the requirements of 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under this deferential standard, a federal habeas court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000).

A state court decision is "contrary to" federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court or if the state court reaches an opposite result in a case involving facts materially indistinguishable from relevant Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively unreasonable." (*Id.*)

## ANALYSIS

### I. Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective in: (1) failing to call two witnesses in support of his self-defense theory; (2) failing to object to testimony regarding his use of aliases; and (3) failing to introduce evidence of his right-handedness. (R. 1, Petition at 7-8.) The appellate court denied these claims on the merits. (*Id.*, Ex. 1.) Respondent contends that the appellate court's conclusions were neither contrary to, nor an unreasonable application of

9

Supreme Court precedent, and thus Petitioner is not entitled to relief on these claims. (R. 16, Answer at 7.) This Court agrees with Respondent.

The standard for evaluating an ineffective assistance claim is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a habeas petitioner must show that: (1) his attorney's representation fell outside "the wide range of reasonable professional assistance"; and (2) he was prejudiced by the attorney's deficient performance. *Id.* at 687, 689. To satisfy the first prong, the petitioner must show that counsel made errors so serious that she was not "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To satisfy the second prong, the petitioner must demonstrate that there is a reasonable probability the result of the proceeding would have been different but for counsel's errors. *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* The Court may address the two *Strickland* prongs in "whichever order is most expedient." *Watson v. Anglin*, ---F.3d---, 2009 WL 804661, at *2 (7th Cir. Mar. 30, 2009). "If it is easier to dispose of an ineffective assistance claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Here, the Illinois appellate court identified *Strickland* as the standard applicable to Petitioner's ineffective assistance claims. (R. 1, Petition, Ex. 1 at 10.) When reviewing a state court's application of *Strickland*, a federal habeas court does not determine whether the application of *Strickland* was incorrect, but rather whether the application was unreasonable, which is a "substantially higher threshold." *Knowles v. Mirzayance*, ---S.Ct.---, 2009 WL 746274, at *8 (U.S. 2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Only a clear error in applying *Strickland* will support granting a writ of habeas corpus. *Allen v.*

*Chandler*, 555 F.3d 596, 600 (7th Cir. 2009).

### a. Failure to Call Witnesses

Petitioner first claims his trial counsel was ineffective in failing to call two eyewitnesses, Jones and Niki, who would have corroborated his self-defense theory. (R. 1, Petition at 9.) Under the *Strickland* standard, Petitioner must show that counsel's performance was deficient, and that the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687; *Wrinkles v. Buss*, 537 F.3d 804, 812-13 (7th Cir. 2008). The Court's review of counsel's performance is "highly deferential," and Petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004). The Illinois appellate court held that Petitioner was unable to overcome that presumption. (R. 1, Petition, Ex. 1 at 11.) Specifically, the appellate court concluded that Herigodt's decision not to call Jones or Niki was sound trial strategy because she reasonably concluded that their testimony would on balance harm rather than help Petitioner's case. (*Id.*)

Under *Strickland*, a lawyer's failure to investigate possible defenses may constitute deficient performance. *See Strickland*, 466 U.S. at 691; *Washington v. Smith*, 219 F.3d 620, 631 (7th Cir. 2000). However, "[t]he Constitution does not oblige counsel to present each and every witness that is suggested to him." *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997). Counsel's decision not to call a witness is sound trial strategy where counsel reasonably determines "that the testimony the witness would give might on balance harm rather than help the defendant." *Toliver v. McCaughtry*, 539 F.3d 766, 775 (7th Cir. 2008) (citations omitted).

Here, the appellate court reasonably concluded that Herigodt's decision not to call Jones or Niki constituted sound trial strategy. Herigodt interviewed Jones and Niki, but decided not to

call them as witnesses after determining that their testimony would bolster the State's theory of the crime and undermine Petitioner's self-defense theory. (R. 1, Petition, Ex. 1 at 8.) Based on the testimony these witnesses offered at the evidentiary hearing, her decision not to call these witnesses was reasonable. The appellate court's determination that Herigodt's performance was sound trial strategy was not an unreasonable application of *Strickland*, and Petitioner's claim therefore fails.

Assuming *arguendo* Herigodt's decision not to call Jones or Niki constituted deficient performance, the appellate court also determined that the failure to call these witnesses did not prejudice Petitioner. (R. 1, Petition, Ex. 1 at 12-13.) As the appellate court determined, there is little likelihood that the outcome of Petitioner's trial would have been different had Jones or Niki testified. As the appellate court noted, the State presented two eyewitnesses who testified that they saw Johnson raise his hands in surrender moments before Petitioner shot him. (*Id.* at 3, 12.) Petitioner offered evidence in support of his self-defense theory, including his own testimony, but the jury rejected this defense. Although Jones and Niki would have corroborated parts of Petitioner's account of the shooting, their testimony also would have lent support to the State's theory that Petitioner shot Johnson in order to eliminate their competition in the drug market.[4] (*Id.* at 2.) Additionally, neither witness would have contradicted Davis' testimony that after the first shot the victim turned to run and Petitioner shot him a second time. (R. 17, Record, Ex. L at 45.) Nor would they have contradicted the medical evidence showing that Johnson was shot once in the chest and once in the back of the leg, which was consistent with Davis' account. (R.

---

[4] There were also some inconsistencies between Petitioner's account and Niki's account, including that Petitioner claimed the victim had reached into his pants just prior to the shooting, whereas Niki claimed the victim was "fumbling with his shirt." (R. 1, Petition, Ex. 1 at 4, 6.)

12

17, Record, Ex. C at 2.) In short, the appellate court's determination that Petitioner was not prejudiced by counsel's failure to call these witnesses was not objectively unreasonable, and therefore, Petitioner fails on the second *Strickland* prong. For these reasons, the Court denies this claim.

### b. Use of Aliases

Next, Petitioner claims that his trial counsel was ineffective in failing to object to questions about his use of aliases. (R. 1, Petition at 17.) When Petitioner testified at trial, the State was allowed to ask him on cross-examination whether he was using the alias "James Hackman" when he fled to Wisconsin following the shooting. (R. 17, Record, Ex. L at 159.) The State also asked him if he had used the aliases "Tobias Jones" and "Curtis Sorrells" in the past. (*Id.* at 160.) Petitioner admitted that he had used these aliases. (*Id.*) Petitioner claims that this line of questioning was improper, and that counsel was ineffective in failing to object to it. (R. 1, Petition at 18.)

The Illinois appellate court rejected this claim, holding that Herigodt's performance was not deficient in this regard, and that Petitioner was not prejudiced by her failure to object. (R. 1, Petition, Ex. 1 at 13-15.) The appellate court reasoned that evidence of Petitioner's use of an alias upon arrest for the crime charged was properly admitted under Illinois law, as was evidence of his three prior convictions. (*Id.* at 15.) In the appellate court's view, "evidence that defendant had used a false name on two prior occasions was harmless, as it merely reflected upon his already suspect credibility." (*Id.*) Again, the sole question for this Court is whether the appellate court's resolution of the claim was an objectively unreasonable application of *Strickland. See* 28 U.S.C. § 2254(d).

13

A claim of ineffective assistance based on counsel's failure to object to certain evidence is "tied to the admissibility of the underlying evidence." *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001). If evidence admitted without objection was admissible under state law, then a defendant's argument fails both prongs of the *Strickland* test. *Hough*, 272 F.3d at 898; *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994). "[F]ailing to object to admissible evidence cannot be a professionally 'unreasonable' action, nor can it prejudice the defendant against whom the evidence was admitted." *Hough*, 272 F.3d at 898.

As the appellate court held, evidence that Petitioner used an alias upon arrest for the shooting of Johnson was admissible under state law. *See People v. Harris*, 866 N.E.2d 162, 175 (Ill. 2007) (evidence of flight and use of an assumed name admissible as "proof of consciousness of guilt" for crimes at issue before the court). Petitioner's prior crimes were also admissible once he decided to take the stand. *People v. Montgomery*, 268 N.E.2d 695, 699-700 (Ill. 1971); *People v. Clay*, 884 N.E.2d 214, 220 (Ill. App. Ct. 2008). Thus, there would have been no basis for counsel to object to this evidence. As for Petitioner's prior use of aliases, the appellate court did not specifically address this point, but it appears this evidence was inadmissible under Illinois law. *See People v. Morrow*, 708 N.E.2d 430, 438 (Ill. App. Ct. 1999) (evidence of defendant's past use of aliases not admissible to attack his credibility); *see also People v. McGee*, 676 N.E.2d 1341, 1348 (Ill. App. Ct. 1997) ("Evidence of the use of an alias is admissible only if material to some issue in the case."). However, assuming counsel was deficient in failing to object to this evidence, Petitioner has failed to establish a reasonable probability that the result of the proceeding would have been different but for counsel's error. Given the evidence properly in the record attacking Petitioner's credibility, the evidence about his prior use of an alias likely had

14

only minimal significance. Furthermore, as the appellate court noted, the State did not dwell on the aliases at trial, nor did evidence of other crimes come in through the few questions asked by the State on this issue. (*See* R. 17, Record, Ex. L at 159-60.) There was also substantial evidence in the record of Petitioner's guilt, including the testimony of several eyewitnesses, the medical evidence, and Petitioner's own admission that he shot the victim. Because the appellate court's resolution of this claim was not objectively unreasonable, the claim is denied.[5]

### c. Evidence of Right-Handedness

Next, Petitioner claims that his trial counsel was ineffective in failing to introduce evidence that he is right-handed.[6] (R. 1, Petition at 21.) Petitioner contends that this evidence would have undermined the credibility of Davis, who testified that Petitioner had approached Johnson with his left hand in his pocket prior to drawing his gun. (*Id.*) The appellate court held that even assuming there was error in counsel's failure to present such evidence, Petitioner could not show prejudice given the other evidence in the record. (R. 1, Petition, Ex. 1 at 16.) Although

---

[5] It is not clear from Petitioner's filings whether he is also claiming that appellate counsel was ineffective in failing to challenge the admission of this evidence on appeal, a claim that he did raise in the state proceedings. (*See* R. 1, Petition at 20; *id.*, Ex. 1 at 15.) To the extent Petitioner is raising such a claim, we conclude that the Illinois appellate court reasonably denied this claim. When an appellate counsel omits "a significant and obvious issue . . . [the court] will deem his performance deficient." *Allen*, 555 F.3d at 603. However, counsel is not required to raise every non-frivolous issue on appeal. *Martin v. Evans*, 384 F.3d 848, 852 (7th Cir. 2004). Since Petitioner was not prejudiced by his trial attorney's error in this regard, appellate counsel could not have been ineffective in failing to raise this argument on appeal. *See Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003) (petitioner must show reasonable probability that issue not raised would have altered the outcome of the appeal).

[6] During deliberations, the jury sent a note to the judge asking several questions, including whether Petitioner was right or left-handed. (R. 17, Record, Ex. L at 98.) The parties agreed that there was no evidence in the record on this point, and further agreed that the judge should instruct the jurors to rely on their collective memories of the evidence and continue with their deliberations. (*Id.* at 100.)

the appellate court did not resolve the first prong of *Strickland*, it was not required to do so if Petitioner could not satisfy the prejudice prong. *See Strickland*, 466 U.S. at 697; *Watson*, 2009 WL 804661, at *2. The appellate court's determination on the prejudice prong was not objectively unreasonable. Even if Davis' testimony would have been undermined by introducing evidence of Petitioner's right-handedness, the crucial aspects of her testimony were corroborated by two other witnesses as well as Petitioner's own testimony, in which he admitted having shot Johnson. (R. 1, Petition, Ex. 1 at 3.) In short, Petitioner has failed to establish a reasonable probability that the result of the proceeding would have been different with the admission of this evidence. Because the Illinois appellate court's resolution of this claim was not objectively unreasonable, the claim is denied.

## II.    Reduction to Second Degree Murder

Petitioner next claims that the State failed to prove him guilty of first degree murder, and that his conviction should accordingly be reduced to second degree murder. (R. 1, Petition at 24.) The legal basis of this claim is somewhat unclear. Petitioner appears to be basing his claim on his belief that he proved self-defense by a preponderance of the evidence. (*See id.* at 25.) Specifically, Petitioner argues that he should have been convicted of second degree murder because he satisfied a mitigating factor under Illinois law in that he believed, albeit mistakenly, that "the use of force was necessary to prevent the killing or infliction of great bodily harm upon himself." (*Id.*) To the extent Petitioner is arguing a violation of state law, this claim is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (matters of state law are outside the purview of federal habeas corpus); *Lambert v. Davis*, 449 F.3d 774, 778 (7th Cir. 2006) ("Federal habeas courts lack subject-matter jurisdiction over [state law]

issues.").

Petitioner suggests that his first degree murder conviction violates *Jackson v. Virginia*, 443 U.S. 307 (1979), which held that the State's evidence must be sufficient to establish each element of the crime beyond a reasonable doubt. (R. 1, Petition at 24.) Petitioner's claim, however, falls outside the scope of *Jackson*. The elements of first degree murder under Illinois law are: (1) the defendant's actions resulted in the victim's death; and (2) the defendant knew his acts would result in the victim's death or had knowledge that his actions created a strong probability of death or great bodily injury to the victim. 720 ILCS 5/9-1(a). Petitioner does not argue that there was insufficient evidence regarding either of these elements; rather, he argues that he introduced sufficient evidence of an affirmative defense to mitigate his offense to second degree murder. (R. 1, Petition at 25.) Under Illinois law, once the state has proven first degree murder, a defendant may have the offense reduced to second degree murder if he demonstrates a mitigating factor by a preponderance of the evidence, including that he believed, albeit mistakenly, that the killing was justified by self-defense. 720 ILCS 5/9-2(a)(2). The absence of a mitigating factor is not an element of first degree murder that must be proven by the State; rather, the burden of proving a mitigating factor is on the defendant. 720 ILCS 5/9-2(c). Further, the Due Process Clause does not require the State to prove the absence of a state created affirmative defense that would reduce a charge of first-degree murder. *Patterson v. New York*, 432 U.S. 197, 210 (1977). For these reasons, Petitioner's claim falls outside of *Jackson*, and instead appears to be premised on his belief that he proved self-defense by a preponderance of the evidence under state law. (R. 1, Petition at 25.) This state law claim is not cognizable in a federal habeas proceeding. *Estelle*, 502 U.S. at 67; *Lambert*, 449 F.3d at 779.

Assuming *arguendo* that Petitioner has raised a cognizable federal claim regarding sufficiency of the evidence, the claim has no merit. Determining sufficiency of the evidence requires the Court to decide whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Challenging the sufficiency of the evidence on appeal is a "daunting task." *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007). As recounted above, there was ample evidence in the record to support the first degree murder conviction, including the testimony of eyewitnesses and Petitioner's own admission that he shot the victim. Regarding Petitioner's claim of self-defense, as the Illinois appellate court concluded:

> [T]he mitigating factor of imperfect self-defense is not established . . . where a defendant acts in a manner entirely inconsistent with mortal fear, approaches an unarmed man whose arms are raised in surrender, and shoots him once in the chest and once after he has turned to run away.

(R. 17, Record, Ex. C at 10.) Although Petitioner testified that the victim reached into his pants before he shot him, eyewitnesses contradicted this testimony. The credibility of witnesses and conflicts in the testimony are to be resolved by the trier of fact. *Bailey*, 510 F.3d at 733. It is not the purview of a reviewing court to decide "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. At this stage, all of the evidence must be construed in the light most favorable to the State, and a review of the record reveals that there is sufficient evidence from which a rational jury could have found the essential elements of first degree murder beyond a reasonable doubt. Accordingly, to the extent Petitioner raises a cognizable federal claim regarding sufficiency of the evidence, the claim has no merit

and is denied.

## III. Sentencing Claim

Petitioner's final claim is that his sentence "does not conform to a statutory requirement under [] Illinois and United States [law]." (R. 1, Petition at 27.) Respondent argues that this claim is not cognizable or is procedurally defaulted. (R. 16, Answer at 21.) Again, the legal basis of this claim is somewhat unclear, but to the extent Petitioner is claiming that his sentence did not comport with state law requirements, the claim is not cognizable in this proceeding. *Estelle*, 502 U.S. at 67; *Lambert*, 449 F.3d at 779. If Petitioner is attempting to raise a challenge to his sentence based on a federal constitutional provision, such as the Eighth Amendment or Due Process Clause of the Fourteenth Amendment, this claim would be procedurally defaulted since he did not raise any such claim in the state proceedings. (*See* R. 17, Record, Ex. A, C, D, F, J.) If a habeas petitioner fails to properly present a claim in state court, he forfeits federal review of the claim. *Curtis v. Montgomery*, 552 F.3d 578, 582 (7th Cir. 2009). Accordingly, the Court cannot reach this claim on the merits.

A procedurally defaulted claim may be reviewed by a federal habeas court if the petitioner can demonstrate cause for failing to raise his claim and resulting prejudice. *House v. Bell*, 547 U.S. 518, 536 (2006). Petitioner does not argue cause and prejudice, nor does it appear on the record that he has any basis for failing to raise this claim in his numerous state filings. Without a showing of cause and prejudice, a federal court can review defaulted claims only if refusal to consider the claims would result in a "miscarriage of justice"---that is, where a constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 299 (1995). Petitioner also does not argue actual innocence, nor

19

does it appear he could satisfy that exacting standard. As discussed above, eyewitnesses testified to seeing Petitioner shoot Johnson after he raised his arms in surrender and shoot him again as he turned to flee. Based on a review of the record, the Court cannot conclude that this case meets the high standard required for the miscarriage of justice exception to apply. *See United States ex rel. Bell v. Pierson*, 267 F.3d 544, 553-54 (7th Cir. 2001) (petitioner did not demonstrate fundamental miscarriage of justice where his self-defense claim was contradicted by eyewitness testimony that he chased the victim and shot him at close range while he sat in his car). Accordingly, Petitioner's sentencing claim is procedurally defaulted, and this Court does not reach the claim on the merits.

## CONCLUSION

For all of these reasons, the Petition for Writ of Habeas Corpus (R. 1) is denied.

ENTERED: *[signature]*

**Judge Ruben Castillo**
**United States District Court**

**Dated: April 16, 2009**